Michael E. Waller
William H. Hyatt, Jr.
K&L Gates LLP
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
Attorneys for Defendant Alcoa Inc. and
Alcoa Domestic LLC, as successor in
interest to Defendant A.P. New Jersey, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NORTH RIVER MEWS ASSOCIATES, LLC and 38 COAH ASSOCIATES, LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>ALCOA CORPORATION; A.P. NEW JERSEY, INC.;  and JOHN DOES 1-25 (fictitious names),<br><br>        Defendants,<br><br>    v.<br><br>RIVER ROAD IMPROVEMENT PHASE II, INC. and FRED A. DAIBES,<br><br>        Counterclaim-Defendants. | Civil Action No.: 2:14-CV-08129 (FSH-JBC)<br><br>**ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES,  AND COUNTERCLAIMS**<br><br>***Document Filed Electronically*** |

Alcoa Inc. (incorrectly named as "Alcoa Corporation") and Alcoa Domestic LLC, as the successor in interest to A.P. New Jersey, Inc., (collectively "Alcoa") by their counsel K&L Gates LLP, answer the Plaintiffs' Complaint as follows:

## THE PARTIES

1.      Alcoa admits the allegations set forth in Paragraph 1.

2.      Alcoa refers to the Complaint in this action for the language therein and its exact meaning and effect.

3.      Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 3, except admits that in 1997 the lot and blocks making up "the Property" as defined in the Complaint was conveyed to Plaintiff North River Mews Associates, LLC.

4.      Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 4.

5.      Alcoa denies the allegations set forth in Paragraph 5, except to admit that Alcoa Inc. is a Pennsylvania corporation with offices at 201 Isabella Street, Pittsburgh, Pennsylvania 15212, and that at one time Alcoa Inc. owned property identified as "the Property" in the Complaint, which was conveyed to Plaintiff North River Mews Associates, LLC in 1997.

6.      Alcoa denies the allegations set forth in Paragraph 6, except to admit that A.P. New Jersey, Inc. was a Delaware corporation that merged into Alcoa Domestic LLC, a wholly-owned subsidiary of Alcoa Inc., in 2010, and that at one time A.P. New Jersey, Inc. owned property identified as "the Property" in the Complaint, which was conveyed to Plaintiff North River Mews Associates, LLC in 1997.

7.      Inasmuch as Paragraph 7 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph

8.      Alcoa refers to the Complaint in this action for the language therein and its exact meaning and effect.

## JURISDICTION AND VENUE

9.      Alcoa can neither admit nor deny the allegations set forth in Paragraph 9, inasmuch as it makes legal conclusions to which Alcoa is not required to respond.

10.     Alcoa can neither admit nor deny the allegations set forth in Paragraph 10, inasmuch as it makes legal conclusions to which Alcoa is not required to respond.

11.     Alcoa can neither admit nor deny the allegations set forth in Paragraph 11, inasmuch as it makes legal conclusions to which Alcoa is not required to respond.

12.     Alcoa objects to the allegations contained in Paragraph 12 to the extent that Paragraph states conclusions to which no responsive pleading is required.  Alcoa denies the remaining factual allegations of Paragraph 12 except to admit that Alcoa conducts business in the State of New Jersey.

## BACKGROUND

13.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 13.

14.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 14.

15.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 15.

16.     Alcoa denies the allegations set forth in Paragraph 16.

17.     Alcoa denies the allegations set forth in Paragraph 17, except to admit that A.P. New Jersey, Inc. disclosed reports detailing known environmental conditions on the Property and permitted Plaintiff North River Mews Associates, LLC to inspect the Property before Plaintiff North River Mews Associates, LLC purchased the Property in 1997.

18.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 18.

19.     Alcoa denies the allegations set forth in Paragraph 19.

20.     Alcoa admits the allegations set forth in Paragraph 20.

21.     Alcoa denies the allegations set forth in Paragraph 21.

22.     Alcoa denies the allegations set forth in Paragraph 22, except to admit that A.P. New Jersey, Inc., pursuant to specific contractual conditions not referenced in the Complaint, agreed to pay Plaintiff North River Mews Associates, LLC for some of its costs to remediate certain PCB contamination.

23.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 23.

24.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 24.

25.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 25.

## FIRST COUNT
## COST RECOVERY UNDER CERCLA § 107

26.     Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 26 of the Complaint.

27.     Alcoa refers to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), for the language therein and its exact meaning and effect.

28.     Alcoa refers to Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), for the language therein and its exact meaning and effect.

29.     Alcoa refers to Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), for the language therein and its exact meaning and effect.

30.     Alcoa can neither admit nor deny the allegations set forth in Paragraph 30, inasmuch as it makes legal conclusions to which Alcoa is not required to respond.  Alcoa admits that Alcoa Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania. Alcoa admits that A.P. New Jersey, Inc. was a Delaware corporation that merged into Alcoa Domestic LLC, a wholly-owned subsidiary of Alcoa Inc., in 2010.

31.     Alcoa can neither admit nor deny the allegations set forth in Paragraph 31, inasmuch as it makes legal conclusions to which Alcoa is not required to respond.

32.     Alcoa denies the allegations contained in Paragraph 32 because they are unrelated to any time period, entity, location, or occurrence that has any consequence to the allegations of the Complaint.

33.     Alcoa can neither admit nor deny the allegations set forth in Paragraph 33, inasmuch as it makes legal conclusions to which Alcoa is not required to respond.

34.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 34.

35.     Alcoa denies the allegations contained in Paragraph 35.

36.     Alcoa denies that Plaintiffs are entitled to the relief set out in Paragraph 36.

## SECOND COUNT
## CERCLA § 113 CLAIMS

37.     Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 37 of the Complaint.

38.     Alcoa refers to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for the language therein and its exact meaning and effect.

39.     Alcoa denies that Plaintiffs are entitled to the relief set out in  Paragraph 39.

## THIRD COUNT
## DECLARATORY JUDGMENT

40.     Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 40 of the Complaint.

41.     Alcoa refers to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), 28 U.S.C. §§ 2201 and 2202, and N.J.S.A. § 2A:16-50 for the language therein and its exact meaning and effect.  Nonetheless, Alcoa denies that it is liable to Plaintiffs under Section 113 of CERCLA, 42 U.S.C. § 9613(f).

42.     Alcoa admits the allegations set forth in Paragraph 42.

43.     Alcoa denies that Plaintiffs are entitled to the relief set out in Paragraph 43.

## FOURTH COUNT
## STRICT LIABILITY

44.     Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 44 of the Complaint.

45.     Alcoa denies the allegations contained in Paragraph 45.

46.     Alcoa denies the allegations contained in Paragraph 46.

47.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 47.

48.     Alcoa denies the allegations contained in Paragraph 48.

49.     Alcoa denies the allegations contained in Paragraph 49.  Alcoa also denies that Plaintiffs are entitled to the relief set out in Paragraph 49.

## FIFTH COUNT
## NEGLIGENCE

50.     Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 50 of the Complaint.

51.     Alcoa denies the allegations contained in Paragraph 51.

52.     Alcoa denies the allegations contained in Paragraph 52.

53.     Alcoa denies the allegations contained in Paragraph 53.

54.     Alcoa denies the allegations contained in Paragraph 54.

55.     Alcoa denies the allegations contained in Paragraph 55.

56.     Alcoa denies the allegations contained in Paragraph 56.  Alcoa also denies that Plaintiffs are entitled to the relief set out in Paragraph 56.

## SIXTH COUNT
## NUISANCE

57.     Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 57 of the Complaint.

58.     Alcoa denies the allegations contained in Paragraph 58.

59.     Alcoa denies the allegations contained in Paragraph 59.

60.     Alcoa denies the allegations contained in Paragraph 60.

61.     Alcoa denies the allegations contained in Paragraph 61.  Alcoa also denies that Plaintiffs are entitled to the relief set out in Paragraph 61.

## SEVENTH COUNT
## SPILL ACT CONTRIBUTION

62.     Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 62 of the Complaint.

63.     Alcoa refers to the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 *et seq.*, for the language therein and its exact meaning and effect.

64.     Alcoa objects to the allegations contained in Paragraph 64 as that Paragraph states legal conclusions to which no responsive pleading is required. Alcoa Inc. admits that it is a corporation organized under the laws of the Commonwealth of Pennsylvania. Alcoa admits that A.P. New Jersey, Inc. was a Delaware corporation that merged into Alcoa Domestic LLC, a wholly-owned subsidiary of Alcoa Inc., in 2010.

65.     Alcoa objects to the allegations contained in Paragraph 65 to the extent that Paragraph states legal conclusions to which no responsive pleading is required. Alcoa denies the remaining factual allegations of Paragraph 65.

66.     Alcoa objects to the allegations contained in Paragraph 66 to the extent that Paragraph states legal conclusions to which no responsive pleading is required. Alcoa denies the remaining factual allegations of Paragraph 66.

67.     Alcoa objects to the allegations contained in Paragraph 67 to the extent that Paragraph states legal conclusions to which no responsive pleading is required. Alcoa denies the remaining factual allegations of Paragraph 67.

68.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 68.

69.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 69.  Nonetheless, Alcoa denies that Plaintiffs are entitled to the relief described in that Paragraph.

## EIGHTH COUNT
## ENVIRONMENTAL RIGHTS ACT

70.     Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 70 of the Complaint.

71.     Alcoa refers to the New Jersey Environmental Rights Act, N.J.S.A. 2A:35-1 *et seq.*, for the language therein and its exact meaning and effect.  Alcoa objects to the allegations contained in Paragraph 71 to the extent that Paragraph states legal conclusions to which no responsive pleading is required.  Alcoa denies the remaining factual allegations of Paragraph 71.

72.     Alcoa denies the allegations set forth in Paragraph 72.  Inasmuch as Paragraph 72 contains allegations related to entities other than Alcoa, Alcoa can neither admit nor deny the remaining allegations set forth in that Paragraph.

73.     Alcoa refers to the New Jersey Environmental Rights Act, N.J.S.A. 2A:35-1 *et seq.*, for the language therein and its exact meaning and effect.  Alcoa objects to the allegations contained in Paragraph 73 to the extent that Paragraph states legal conclusions to which no responsive pleading is required.  Alcoa denies the remaining factual allegations of Paragraph 73.  Furthermore, Alcoa denies that Plaintiffs are entitled to the relief described in that Paragraph.

## NINTH COUNT
## NEGLIGENT OR FRAUDULENT CONCEALMENT

74.     Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 74 of the Complaint.

75.     Alcoa denies the allegations set forth in Paragraph 75, except to admit that Alcoa Inc. stored substances containing PCBs at the Property during Alcoa Inc.'s ownership of the Property and that substances containing PCBs were present on the Property during A.P. New Jersey, Inc.'s ownership of the Property.

76.     Alcoa denies the allegations contained in Paragraph 76.

77.     Alcoa denies the allegations contained in Paragraph 77.

78.     Alcoa objects to the allegations contained in Paragraph 78 to the extent that Paragraph states legal conclusions to which no responsive pleading is required.  Alcoa denies the remaining factual allegations of Paragraph 78.

79.     Alcoa denies the allegations contained in Paragraph 79.  Alcoa also denies that Plaintiffs are entitled to the relief set out in Paragraph 79.

## TENTH COUNT
## CONSUMER FRAUD ACT

80.     Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 80 of the Complaint.

81.     Alcoa denies the allegations contained in Paragraph 81.

82.     Alcoa denies the allegations contained in Paragraph 82.  Alcoa denies that Plaintiffs are entitled to the relief set out in Paragraph 82.

## ELEVENTH COUNT
## BREACH OF CONTRACT

83.     Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 83 of the Complaint.

84.     Alcoa denies the allegations set forth in Paragraph 84, except to admit that A.P. New Jersey, Inc., pursuant to specific contractual conditions not referenced in the Complaint, agreed to pay Plaintiff North River Mews Associates, LLC for some of its costs to remediate certain PCB contamination.

85.     Alcoa denies the allegations contained in Paragraph 85.

86.     Alcoa denies the allegations contained in Paragraph 86.  Alcoa also denies that Plaintiffs are entitled to the relief set out in Paragraph 86.

## TWELFTH COUNT
## UNJUST ENRICHMENT

87.     Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 87 of the Complaint.

88.     To the extent it alleges that Plaintiffs have incurred or will incur costs for remediation of the Property, Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 88.  Alcoa denies the remaining allegations of Paragraph 88.

89.     To the extent it alleges that Plaintiffs have incurred or will incur costs for remediation of the Property, Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 89.  Alcoa objects to the allegations contained in

Paragraph 89 to the extent that Paragraph states legal conclusions to which no responsive pleading is required.  Alcoa denies the remaining factual allegations of Paragraph 89.

90.    Alcoa objects to the allegations contained in Paragraph 90 to the extent that Paragraph states legal conclusions to which no responsive pleading is required.  Alcoa denies the remaining factual allegations of Paragraph 90.  Furthermore, Alcoa denies that Plaintiffs are entitled to the relief described in that Paragraph.

**THIRTEENTH COUNT**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

91.    Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 91 of the Complaint.

92.    Alcoa can neither admit nor deny the allegations set forth in Paragraph 92, inasmuch as it makes legal conclusions to which Alcoa is not required to respond.

93.    Alcoa can neither admit nor deny the allegations set forth in Paragraph 93, inasmuch as it makes legal conclusions to which Alcoa is not required to respond.

94.    Alcoa objects to the allegations contained in Paragraph 94 to the extent that Paragraph states legal conclusions to which no responsive pleading is required.  Alcoa denies the remaining factual allegations of Paragraph 94.

95.    Alcoa denies the allegations contained in Paragraph 95.

96.    Alcoa denies the allegations set forth in Paragraph 96.  Alcoa also denies that Plaintiffs are entitled to the relief set out in Paragraph 96.

**AFFIRMATIVE DEFENSES**

**FIRST AFFIRMATIVE DEFENSE**

Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by reason of laches, estoppel, waiver, consent, unclean hands, res judicata, and/or other equitable defenses.

## THIRD AFFIRMATIVE DEFENSE

The applicable statute or statutes of limitations or other applicable law, rule, statute or regulation controlling or requiring the institution of suit within a certain period of time following its accrual, was not complied with by Plaintiffs, for some or all of Plaintiffs' alleged costs; accordingly, Plaintiffs' claims are barred as a matter of law.

## FOURTH AFFIRMATIVE DEFENSE

The Complaint does not describe the claims made with sufficient particularity to determine what defenses may apply and Alcoa reserves the right to assert additional affirmative defenses as discovery progresses. Alcoa adopts and incorporates herein all defenses raised by any future Defendants or Third-Party Defendants, except to the extent that such defenses would shift liability to Alcoa.

## FIFTH AFFIRMATIVE DEFENSE

Alcoa has a complete defense to any liability under the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA") pursuant to CERCLA § 107(b)(3), 42 U.S.C. § 9607(b)(3), inasmuch as the alleged release or threatened release was caused solely by the acts or omissions of unrelated third parties who were not agents or employees of Alcoa and with whom Alcoa had no contractual relationship; Alcoa exercised due care as to any alleged hazardous substances; and Alcoa took precautions against foreseeable third-party acts or omissions, and against the foreseeable consequences of such acts or omissions, within the meaning of CERCLA § 107(b), 42 U.S.C. § 9607(b).

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff has no claim under CERCLA because Plaintiff has failed to establish a prima facie case.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff has no claim under CERCLA because Alcoa Inc. and A.P. New Jersey, Inc. are not covered persons within the meaning of CERCLA.

## EIGHTH AFFIRMATIVE DEFENSE

"Hazardous substances," as defined in CERCLA § 101(14), 42 U.S.C. § 9601(14) were not released into the environment by Alcoa within the meaning of the word "release" as defined in CERCLA § 101(22), 42 U.S.C. § 9601(22).  Even if there were "hazardous substances," as defined in CERCLA § 101(14), 42 U.S.C. § 9601(14) released into the environment by Alcoa within the meaning of the word "release" as defined in CERCLA § 101(22), 42 U.S.C. § 9601(22), which Alcoa denies, such release did not include the alleged contamination that is the subject of this Action.

## NINTH AFFIRMATIVE DEFENSE

The costs incurred or to be incurred by Plaintiffs and which Plaintiffs seek to recover in this action are not recoverable to the extent that they are not necessary costs of response consistent with the National Contingency Plan.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to allege or establish the required nexus between Alcoa and the property and alleged response costs that are the subject of this Action.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred to the extent that Plaintiffs did not comply with the statutory and/or regulatory prerequisites necessary to bring a CERCLA action.

## TWELFTH AFFIRMATIVE DEFENSE

To the extent that any or all of the Defendants are found liable in this matter, joint and several liability is inappropriate because the harms are divisible and there are reasonable bases for apportionment of the harms suffered.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs have no claim under the Spill Compensation and Control Act, N.J.S.A. § 58:10-23.11 *et seq.* ("Spill Act" or "Act") because neither Alcoa Inc. nor A.P. New Jersey, Inc. are dischargers and/or responsible persons within the meaning of the Act, and/or Plaintiffs' damages, if any, are the result of conduct occurring prior to the effective date of the Spill Act.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred to the extent that Plaintiffs did not comply with the requirements and prerequisites of the Spill Act.

## FIFTEENTH AFFIRMATIVE DEFENSE

In the event that Plaintiffs are entitled to contribution under the Spill Act, such relief is limited to "clean up and removal costs" as defined at N.J.S.A. § 58:10-23b.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the statutory defenses to liability provided by the Spill Act.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the Plaintiffs' own breach of contract.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred or subject to reduction by reason of Plaintiffs' failure to mitigate their alleged damages.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiffs' alleged damages have been caused solely by the acts of third parties over whom Alcoa had no control or right of control or by superseding or intervening conduct of others outside of Alcoa's control.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred or subject to reduction because the damages claimed include costs that are not reasonable or necessary.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the terms of the contract between the parties.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by Plaintiffs' releases, which waived Plaintiffs' right to seek contribution for response costs or claims arising from the actions or inactions of previous owners relating to PCBs or other hazardous substances as defined by the applicable environmental laws.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of set off.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of recoupment.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Without conceding any detrimental reliance on the part of Plaintiffs, any such reliance by the Plaintiffs was  unreasonable because Plaintiffs were aware of the presence of PCBs on the

Property, had access to environmental reports detailing the conditions of the Property including PCBs, had the opportunity to inspect the Property, and expressly disclaimed reliance on representations regarding, among other things, the presence or removal of hazardous or toxic materials, substances, or wastes in, on, under, or about the Property.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

Any loss suffered by Plaintiffs was as a result of their own negligence, or the negligence or fault of their agents, which negligence or fault is greater than any alleged negligence of Alcoa, which negligence is specifically denied.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

The damages which Plaintiffs seek, if awarded, would unjustly enrich Plaintiffs.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred or subject to reduction by reason of Plaintiffs' own contributory negligence.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred or subject to reduction by reason of the doctrine of comparative negligence or the Joint Tortfeasor Contribution Act.

## THIRTIETH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred because Alcoa's conduct was in accordance with the course of dealing established between Plaintiffs' and Alcoa.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred or subject to reduction because Alcoa is entitled to common law indemnification from Plaintiffs.

## THIRTY-SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred or subject to reduction because Alcoa is entitled to common law contribution from Plaintiffs.

## THIRTY-THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred insofar as Plaintiffs seek to recover costs that they have incurred or will incur to comply with their independent legal obligations under state and federal environmental laws other than CERCLA, 42 U.S.C. § 9601 *et seq.*, regardless of any act or omission by Alcoa.

## THIRTY-FOURTH AFFIRMATIVE DEFENSE

Alcoa is not a professional seller of real estate, and as such is not liable to Plaintiffs under the New Jersey Consumer Fraud Act.

## THIRTY-FIFTH AFFIRMATIVE DEFENSE

Plaintiffs did not purchase the Property identified in the Complaint in a consumer capacity.

## THIRTY-SIXTH AFFIRMATIVE DEFENSE

Alcoa has not violated any statute, regulation or ordinance designed to minimize pollution or impairment of the environment and is in compliance in good faith with any applicable pollution abatement schedule the purpose of which is alleviation of the damage to the environment alleged in the Complaint.

## THIRTY-SEVENTH AFFIRMATIVE DEFENSE

The relevant governmental authorities have exercised and continue to exercise supervision over the Property and contamination alleged in the Complaint.

## THIRTY-EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs knew of the presence of hazardous substances, including PCBs, but Plaintiffs assumed the risk of contamination when they willingly purchased the property; thus, Alcoa is not liable to Plaintiffs in strict liability for an abnormally dangerous activity.

## THIRTY-NINTH AFFIRMATIVE DEFENSE

Plaintiffs' own bad faith bars their claim for breach of the implied covenant of good faith and fair dealing.

## COUNTERCLAIMS

Defendant Alcoa Inc. (incorrectly named as "Alcoa Corporation"), a Pennsylvania corporation having its principal place of business at 390 Park Avenue, New York, New York 10022-4608, and Alcoa Domestic LLC, a Delaware limited liability company having its principal place of business at 201 Isabella Street, Pittsburgh, Pennsylvania 15212-5858, as the successor in interest to Defendant A.P. New Jersey, Inc., (collectively "Alcoa") by their counsel K&L Gates LLP, by way of counterclaim against the Plaintiffs, North River Mews Associates, LLC and 38 COAH Associates, LLC, and against Counterclaim-Defendants River Road Improvement Phase II, Inc. and Fred A. Daibes, say:

## THE PARTIES

1.     Plaintiff North River Mews Associates, LLC ("North River") is a New Jersey limited liability company with offices at 1000 Portside Drive, Edgewater, New Jersey 07020.

2.     Plaintiff 38 COAH Associates, LLC ("38 COAH") is a New Jersey limited liability company with offices at 1000 Portside Drive, Edgewater, New Jersey 07020.

3.     Counterclaim-Defendant River Road Improvement Phase II, Inc. ("RRIP") is a New Jersey corporation with a business address at P.O. Box 36, Edgewater, New Jersey 07020.

4.     Counterclaim-Defendant Fred A. Daibes ("Daibes") is an individual domiciled in the state of New Jersey.  On information and belief, at all relevant times, Daibes owned or controlled North River, 38 COAH, and RRIP.

## JURISDICTION AND VENUE

5.     These counterclaims arise under federal law, 42 U.S.C. § 9613(f).  The United States District Court has original jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1331.

6.     This court has supplemental jurisdiction over Alcoa's state law counterclaims pursuant to 28 U.S.C. § 1367(a) because Alcoa's state law counterclaims are related to the same case or controversy as Alcoa's counterclaim for contribution under 42 U.S.C. § 9613(f).

7.     Plaintiffs have consented to venue in this court by filing their Complaint.  Venue is also proper in this court pursuant to 42 U.S.C. § 9613(b), as the alleged release or damages occurred in this district.  Furthermore, a substantial part of the actions or omissions giving rise to these counterclaims occurred in this district.

## STATEMENT OF COUNTERCLAIMS

8.     North River was formed on or about May 1, 1997 for the purpose of real estate development.

9.     RRIP was incorporated on or about May 2, 1997.

10.     On or about June 27, 1997, Defendant A.P. New Jersey, Inc. ("A.P."), North River, and RRIP, among other parties, entered into a valid contract (the "Multi-Party Property Acquisition Agreement"), pursuant to which North River agreed to buy certain property in the Borough of Edgewater from A.P.  A copy of the Multi-Party Property Acquisition Agreement is annexed hereto as Exhibit A.

11.     The property North River purchased from A.P. encompasses the "Property" that is defined in the Plaintiffs' Complaint and that is the subject of the Complaint.

12.     Daibes executed the Multi-Party Property Acquisition Agreement on behalf of North River as the managing member of North River.

13.     Daibes executed the Multi-Party Property Acquisition Agreement on behalf of RRIP as the president of RRIP.

14.     Pursuant to Paragraph 2 of the Multi-Party Property Acquisition Agreement, North River and RRIP agreed to demolish and remove structures on the Property.

15.     Also pursuant to Paragraph 2 of the Multi-Party Property Acquisition Agreement, North River and RRIP further agreed that this demolition and removal would be completed in accordance with the Remedial Action Workplan submitted to the New Jersey Department of Environmental Protection and with the demolition plan reviewed and approved by A.P.

16.     Pursuant to Paragraph 16 of the Multi-Party Property Acquisition Agreement, North River and RRIP agreed to defend and save A.P. harmless from any and all claims arising from the performance of that Agreement.

17.     Also pursuant to Paragraph 16 of the Multi-Party Property Acquisition Agreement, North River and RRIP further agreed to reimburse A.P. for the cost of any legal, expert, or other fees expended by A.P. arising from such claims.

18.     On or about June 1997, A.P. and North River entered into a valid contract (the "Purchase and Sale Agreement"), pursuant to which A.P. agreed to sell certain property located in Edgewater, New Jersey to North River.  A copy of the Purchase and Sale Agreement is annexed hereto as Exhibit B.

19.     Daibes executed the Purchase and Sale Agreement on behalf of North River as the president and managing member of North River.

20.     On or about August 25, 1997, A.P. and North River entered into a valid contract (the "Parking Lot Agreement"), pursuant to which A.P. agreed to sell certain property located in Edgewater, New Jersey to North River.  A copy of the Parking Lot Agreement is annexed hereto as Exhibit C.

21.     Daibes executed the Parking Lot Agreement on behalf of North River as the president and managing member of North River.

22.     The Purchase and Sale Agreement and the Parking Lot Agreement conveyed the Property that is the subject of the Multi-Party Property Acquisition Agreement and that is the subject of Plaintiffs' Complaint to North River.

23.     The Multi-Party Property Acquisition Agreement is incorporated by reference into the Purchase and Sale Agreement pursuant to paragraph 6(a)(ii) of the Purchase and Sale Agreement.

24.     The Multi-Party Property Acquisition Agreement is incorporated by reference into the Parking Lot Agreement pursuant to paragraph 7(d) of the Parking Lot Agreement.

25.     The Purchase and Sale Agreement contemplated that North River and RRIP would remove the abandoned industrial structures and develop the Property, at least in part, for residential use and pursuant to paragraph 2 of that agreement the purchase price for the Property was dependent on the number of units approved for construction on the Property.

26.     Pursuant to paragraph 7(f) of the Purchase and Sale Agreement, North River agreed to indemnify, defend, and hold A.P. harmless from any and all claims, including all foreseeable and unforeseeable consequential damages related to North River's (or, during North River's ownership of the Property, any operators' or third parties') use of the Property and/or any and all activities related thereto.

27.     Pursuant to paragraph 7(g) of the Purchase and Sale Agreement, North River expressly released and agreed to waive all rights it may have to seek contribution from A.P. for any response costs or claims that may arise as the result of the actions or inactions of A.P. or any

previous owner or operator of the Property relating to Hazardous Substances, as defined in the Purchase and Sale Agreement.

28.     The definition of Hazardous Substances in the Purchase and Sale Agreement includes PCBs.

29.     Pursuant to paragraph 7(c) of the Parking Lot Agreement, North River agreed to indemnify, defend, and hold A.P. harmless from any and all claims, including all foreseeable and unforeseeable consequential damages related to North River's (or, during North River's ownership of the Property, any operators' or third parties') use of the Property and/or any and all activities related thereto.

30.     Pursuant to paragraph 7(d) of the Parking Lot Agreement, North River expressly released and agreed to waive all rights it may have to seek contribution from A.P. for any response costs or claims that may arise as the result of the actions or inactions of A.P. or any previous owner or operator of the Property relating to Hazardous Substances, as defined in the Parking Lot Agreement.

31.     The definition of Hazardous Substances in the Parking Lot Agreement includes PCBs.

32.     Pursuant to Paragraph 8(b)(ii)(B) of the Parking Lot Agreement, Daibes executed a Personal Guaranty promising to pay liquidated damages to A.P. in the event that North River defaulted on the Multi-Party Agreement or the Parking Lot Agreement.

33.     Daibes' address given on the Personal Guaranty is the same as the address given by North River on the deeds conveying the Property from A.P. to North River.

34.     On or about January 14, 1999, North River filed a Deed Notice regarding the Property and in particular Building 12 with the Bergen County Clerk.

24

35.     The Deed Notice provided that it could be terminated only upon the filing with the Bergen County Clerk of an instrument executed by NJDEP.

36.     Daibes executed the Deed Notice on behalf of North River as the managing member of North River.

37.     On or about March 9, 1999, the New Jersey Department of Environmental Protection ("NJDEP") issued a no further action letter regarding the Property.

38.     By letter to Daibes dated March 15, 1999, NJDEP clarified that its March 1999 no further action letter did not apply to the portion of the Property that included Building 12.

39.     On or about March 13, 1999, A.P., North River, and RRIP entered into a valid contract (the "Environmental Indemnity Agreement"), pursuant to which North River and RRIP agreed to indemnify, defend, and hold A.P. harmless from any and all claims, including all foreseeable and unforeseeable consequential damages, occurring before, during, or after North River's ownership of the Property, relating to Building 12 and the land under and adjacent thereto including remediation and disposal costs and expenses related to PCBs.  A copy of the Environmental Indemnity Agreement is annexed hereto as Exhibit D.

40.     Daibes executed the Environmental Indemnity Agreement on behalf of North River as the president and managing member of North River.

41.     Daibes executed the Environmental Indemnity Agreement on behalf of RRIP as the president of RRIP.

42.     On or about February 12, 2003, NJDEP issued a restricted use no further action letter regarding the Property and in particular Building 12.  The February 2003 restricted use no further action letter required North River and its successors to comply with the Deed Notice.

43.     38 COAH was formed on or about May 22, 2006.

44.     On or about May 22, 2006, North River transferred the Property to 38 COAH.

45.     On or about October 19, 2010, 38 COAH recorded a Termination of Deed Notice regarding Building 12.  Daibes signed the Termination of Deed Notice on behalf of 38 COAH.

46.     The Borough of Edgewater's First Amended Complaint in *Borough of Edgewater v. Waterside Construction, LLC et al.* (Case No. 2:14-cv-05060 (ES-MAH)) (D.N.J.) ("*Borough of Edgewater* Case") alleges that, contrary to the requirements of the Deed Notice, the Termination of Deed Notice was not executed by NJDEP.

47.     Plaintiffs' Complaint alleges that two underground storage tanks on the Property contain PCBs and other unspecified hazardous materials.

48.     Plaintiffs' Complaint alleges that the presence of PCBs and other alleged hazardous materials has hindered Plaintiffs' ability to develop the Property.

49.     Plaintiffs' excavation on the Property in the course of development disturbed and spread such alleged PCBs and other hazardous materials on the Property.

50.     On information and belief, Daibes, as the managing member of the Plaintiff limited liability companies, has participated and does participate in decision-making regarding excavation on the Property, demolition of structures on the Property, and disposal of the alleged PCBs and other hazardous materials.

## COUNT I

51.     Alcoa repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 50 of these Counterclaims as if set forth more fully herein.

52.     The First Amended Complaint in the *Borough of Edgewater* Case alleges that certain entities controlled by Daibes, including North River, deposited fill material contaminated with PCBs at Veteran's Field, a public park owned by the Borough of Edgewater.

26

53. The First Amended Complaint in the *Borough of Edgewater* Case further alleges that said contaminated fill material was transported from the same Property that is the subject of this action.

54. All named parties to this action are defendants or third-party defendants in the *Borough of Edgewater* Case.

55. The Multi-Party Property Acquisition Agreement is a valid contract between A.P., North River, and RRIP.

56. A.P. has duly performed all of its obligations under the Multi-Party Property Acquisition Agreement.

57. Although Alcoa continues to deny the allegations that contaminated fill material transported to or disposed at Veteran's Field originated at the Alcoa Site as defined in the First Amended Complaint in the *Borough of Edgewater* Case, to the extent it is shown that Plaintiffs or any other person caused contaminated fill material from the Property to be transported to or disposed at Veteran's Field, such transportation or disposal constitutes a breach of the Multi-Party Property Acquisition Agreement by North River and RRIP.

58. As a direct and proximate result of North River and RRIP's breach of contract, Alcoa Domestic LLC, as successor in interest to A.P., has suffered damages in an amount to be determined at trial.

## COUNT II

59. Alcoa repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 58 of these Counterclaims as if set forth more fully herein.

60. The Multi-Party Property Acquisition Agreement is a valid contract between A.P., North River, and RRIP.

61.     A.P. has duly performed its obligations under the Multi-Party Property Acquisition Agreement.

62.     The Purchase and Sale Agreement is a valid contract between A.P. and North River.

63.     A.P. has duly performed its obligations under the Purchase and Sale Agreement.

64.     The Parking Lot Agreement is a valid contract between A.P. and North River.

65.     A.P. has duly performed its obligations under the Parking Lot Agreement.

66.     The Environmental Indemnity Agreement is a valid contract between A.P., North River, and RRIP.

67.     A.P. has duly performed its obligations under the Environmental Indemnity Agreement.

68.     Although Alcoa continues to deny the allegations of the Complaint that underground storage tanks on the Property contain PCBs or some other hazardous materials, Alcoa Domestic LLC, as successor in interest to A.P., is entitled to indemnification in an amount to be determined at trial from North River and RRIP for any costs, expenses, or liability borne by Alcoa arising from the presence of such substances on the Property.

69.     Alcoa Domestic LLC, as successor in interest to A.P., is entitled to reimbursement from North River and RRIP for the cost of any legal, expert, or other fees expended by Alcoa arising from the presence of such substances on the Property.

## COUNT III

70.     Alcoa repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 69 of these Counterclaims as if set forth more fully herein.

71.     While Alcoa denies any and all negligence or responsibility for any damages, in the event that Alcoa is adjudged liable for any loss, damage, or injury the Plaintiffs may have sustained, Alcoa is entitled to assert, and hereby asserts, a counterclaim for contribution against Plaintiffs and Counterclaim-Defendants pursuant to the provisions of the New Jersey Joint Tortfeasors Contribution Act, N.J.S.A. § 2A:53A-1 *et seq.* and the Comparative Negligence Act, N.J.S.A. § 2A:15-5.1 *et seq.*

## COUNT IV

72.     Alcoa repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 71 of these Counterclaims as if set forth more fully herein.

73.     Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1) provides that "any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under ... section 9607(a) of this title."

74.     Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), provides that any "covered person" "shall be liable for ... necessary costs of response by any other person consistent with the national contingency plan."

75.     Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), provides that the owner and operator of a facility is liable as a "covered person."

76.     Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), provides that "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" is liable as a "covered person."

77.     Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), provides that "any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances owned or possessed by such person" is liable as a "covered person."

29

78.     Plaintiffs and Daibes are "persons" within the meaning of CERCLA § 101(21), 42 U.S.C. § 9601(21).

79.     The Property is a "facility" within the meaning of CERCLA § 101(9), 42 U.S.C. § 9601(9).

80.     The Plaintiffs' complaint alleges that there has been a release, threatened release, or disposal at the Property of PCBs and other unspecified hazardous materials, all of which are alleged to be "hazardous substances" under CERCLA § 101(14), 42 U.S.C. § 9601(14).

81.     Plaintiffs and Daibes are or were owners and operators of the Property within the meaning of CERCLA § 101(20), 42 U.S.C. § 9601(20).

82.     As owners and operators of a facility at which Plaintiffs allege there has been a release, threatened release, or disposal of hazardous substances, Plaintiffs and Daibes are liable under CERCLA § 107(a)(1)-(2), 42 U.S.C. § 9607(a)(1)-(2).

83.     Plaintiffs and Daibes have arranged, by contract, agreement, or otherwise, for disposal of hazardous substances at the Property and as such are liable under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

84.     Pursuant to CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1), Alcoa is entitled to maintain a contribution action against Plaintiffs and Daibes with respect to any response costs which Plaintiffs seek to recover from Alcoa.

## COUNT V

85.     Alcoa repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 84 of these Counterclaims as if set forth more fully herein.

86.     The New Jersey Spill Compensation and Control Act ("Spill Act"), N.J.S.A. § 58:10-23.11 *et seq.*, provides, in pertinent part, that "[w]henever one or more dischargers or

30

persons clean up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance who are liable for the cost of cleanup." N.J.S.A. § 58:10-23.11f(a)(2).

87.    Under the Spill Act, responsible parties are jointly and severally liable to the State for cleanup and removal costs related to discharges of hazardous substances.

88.    PCBs are a hazardous substance as defined in the Spill Act, N.J.S.A. § 58:10-23.11b.

89.    The Complaint alleges that "discharges" within the meaning of the Spill Act, N.J.S.A. § 58:10-23.11b, have occurred at the Property.

90.    Plaintiffs are dischargers or persons in any way responsible for a discharge under the Spill Act, as the alleged discharges have occurred during Plaintiffs' ownership of the Property.

91.    Daibes is a discharger or person in any way responsible for a discharge under the Spill Act, as he directed the day-to-day operations of Plaintiffs while the alleged discharges occurred at the Plaintiffs' Property.

92.    Pursuant to the Spill Act, N.J.S.A. § 58:10-23.11f(a)(2), Alcoa is entitled to maintain a contribution action against Plaintiffs and Daibes with respect to any cleanup and removal costs which Plaintiffs seek to recover from Alcoa.

## COUNT VI

93.    Alcoa repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 92 of these Counterclaims as if set forth more fully herein.

31

94.    On information and belief, Daibes created North River, 38 COAH, and RRIP as vehicles for his personal investment in the Property.

95.    Daibes formed North River and RRIP for the sole purpose of acquiring and developing the Property, as these entities were formed in the month before North River acquired the Property and North River and RRIP executed the Multi-Party Property Acquisition Agreement.

96.    Daibes formed 38 COAH for the sole purpose of transferring the Property between LLCs that he controls, as Daibes formed 38 COAH on the same day that North River transferred the Property to 38 COAH.

97.    Daibes is and has been the sole principal working on behalf of North River, 38 COAH, and RRIP.  These entities are facades for the operations of Daibes, their dominant member or shareholder.

98.    Daibes executed various agreements in his dealings with Alcoa as the managing member or shareholder of North River, 38 COAH, and RRIP.  In the course of Alcoa's dealings with North River, 38 COAH, and RRIP, no person other than Daibes acted on behalf of those entities.

99.    Publicly available documents indicate that Daibes is the sole principal of North River, 38 COAH, and RRIP.

100.    On information and belief, North River, 38 COAH, and RRIP are grossly undercapitalized.

101.    Daibes was aware of the presence of hazardous substances, including PCBs, on the Property when North River acquired the Property and when North River transferred the Property to 38 COAH.

102.   On information and belief, North River, 38 COAH, and RRIP do not and have not held significant assets other than the Property itself.  Given Daibes' knowledge of contamination on the Property, he formed these entities in an attempt to avoid potential environmental liability.

103.   On information and belief, North River, 38 COAH, and RRIP have not observed corporate formalities and do not maintain corporate records.

104.   Furthermore, RRIP has been an inactive corporation since 2005 due to its failure to file its annual report with the State of New Jersey for two consecutive years.

105.   There is such unity of interest and ownership that the separate personalities of Daibes and North River, 38 COAH, and RRIP no longer exist.  Daibes has abused the corporate form by creating these limited liability companies and corporation to advance his own personal interests.

106.   The Borough of Edgewater has alleged that 38 COAH filed the Termination of Deed Notice without NJDEP approval in order to begin the development of the Property that gave rise to Plaintiffs' Complaint.

107.   By wrongfully filing the Termination of Deed Notice, Daibes and 38 COAH have perpetrated a fraud or injustice or otherwise circumvented the law.

108.   By causing Plaintiffs' to bring this Complaint against Alcoa, Daibes seeks to perpetrate a fraud or injustice and circumvent the clear terms of the agreements entered into by his corporate alter egos that indemnify and release Alcoa from Plaintiffs' claims.

109.   Therefore, Daibes should be held liable for the debts and obligations that North River, 38 COAH, and RRIP, his corporate alter egos, owe to Alcoa.

## **PRAYER FOR RELIEF**

WHEREFORE, Alcoa respectfully requests the following relief from this Court:

A.       Enter judgment in favor of Alcoa Domestic LLC, as successor in interest to Defendant A.P. New Jersey, Inc., and against Plaintiff North River Mews Associates, LLC, Counterclaim-Defendant River Road Improvement Phase II, Inc., and Counterclaim-Defendant Fred A. Daibes finding that North River Mews Associates, LLC and River Road Improvement Phase II, Inc. have breached their contractual obligations to Alcoa Domestic LLC;

B.       Enter judgment for all damages, monetary, consequential, and otherwise, available under law to Alcoa Domestic LLC arising from Plaintiff North River Mews Associates, LLC, Counterclaim-Defendant River Road Improvement Phase II, Inc., and Counterclaim-Defendant Fred A. Daibes' breaches of contract;

C.       Declare that Plaintiff North River Mews Associates, LLC, Counterclaim-Defendant River Road Improvement Phase II, Inc., and Counterclaim-Defendant Fred A. Daibes are obligated to indemnify, defend, and hold harmless Alcoa Domestic LLC, as successor in interest to Defendant A.P. New Jersey, Inc., with respect to the Plaintiffs' claims in this action and any crossclaims, third-party claims, or other claims that may be asserted against Alcoa in this action;

D.       Order Plaintiff North River Mews Associates, LLC, Counterclaim-Defendant River Road Improvement Phase II, Inc., and Counterclaim-Defendant Fred A. Daibes to reimburse Alcoa Domestic LLC, as successor in interest to Defendant A.P. New Jersey, Inc., for the cost of legal, expert, or other fees occurred by Alcoa Domestic LLC arising from the demolition and removal of structures on the Property;

34

E.      Declare that Plaintiffs and Counterclaim-Defendant Fred A. Daibes are liable under CERCLA Section 113(f) for Plaintiffs' and Fred A. Daibes' share of necessary response costs incurred by Plaintiffs consistent with the national contingency plan in connection with the contamination alleged in the Complaint;

F.      Award Alcoa an amount determined by the Court to satisfy the obligation of each Plaintiff and Counterclaim-Defendant Fred A. Daibes under CERCLA;

G.      Declare that Plaintiffs and Counterclaim-Defendant Fred A. Daibes are liable to Alcoa for contribution for costs incurred pursuant to the New Jersey Spill Act;

H.      Award Alcoa an amount determined by the Court to satisfy the obligation of each Plaintiff and of Counterclaim-Defendant Fred A. Daibes under the New Jersey Spill Act; and

I.      Award Alcoa interest, costs of this action, including reasonable attorneys' fees to the extent permitted by law, and such other and further relief as the Court determines is just, equitable, and appropriate.

Dated: March 17, 2015

Respectfully submitted,

**K&L GATES LLP**

By: /s/ Michael E. Waller
Michael E. Waller
William H. Hyatt, Jr.
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
michael.waller@klgates.com
william.hyatt@klgates.com

*Attorneys for Defendant Alcoa Inc. and Alcoa Domestic LLC, as successor in interest to Defendant A.P. New Jersey, Inc.*

## CERTIFICATION PURSUANT TO RULE 11.2 OF THE LOCAL CIVIL RULES OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

I hereby certify that the matter in controversy is the subject of another action pending in this Court, *Borough of Edgewater v. Waterside Construction, LLC et al.*, Case No. 2:14-cv-05060 (ES-MAH).  The Plaintiff in that action is the Borough of Edgewater.  The named Defendants in that action are Waterside Construction, LLC; 38 COAH, LLC; Daibes Brothers, Inc.; North River Mews Associates, LLC; Fred A. Daibes; TERMS Environmental Services, Inc.; Alcoa Inc. (incorrectly named as "Aluminum Company of America"); and A.P. New Jersey, Inc.  Third-Party Plaintiff Alcoa Domestic LLC, as successor in interest to A.P. New Jersey, Inc., has joined the County of Bergen and River Road Improvement Phase II, Inc. as Third-Party Defendants.  Third-Party Plaintiffs Waterside Construction, LLC; 38 COAH, LLC; Daibes Brothers, Inc.; North River Mews Associates, LLC; and Fred A. Daibes have joined Neglia Engineering Associates as a Third-Party Defendant.


Dated: March 17, 2015

By: _____
    Michael E. Waller

# EXHIBIT A

02/24/99  WED 11:08 FAX

## MULTI-PARTY PROPERTY ACQUISITION AGREEMENT

THIS AGREEMENT made this __27th__ day of __June__, 1997

BETWEEN:     A.P. NEW JERSEY, INC.,
             a New Jersey Corporation
             (hereinafter called "A.P.")

AND:         COUNTY OF BERGEN
             A Body Politic and Corporate
             of the State of New Jersey
             (hereinafter called the "County")

AND:         NORTH RIVER MEWS ASSOCIATES, L.L.C.
             a New Jersey Limited Liability Company
             (hereinafter called "North River")

AND:         RIVER ROAD IMPROVEMENT PHASE II, INC.
             A New Jersey Corporation
             (hereinafter called the "RRIP")

### W I T N E S S E T H:

WHEREAS, North River is the fee owner and/or contract owner of certain lands under development or subject to plans for development, such lands being adjacent or in proximity to a segment of River Road (Phase II) located in the Borough of Edgewater, County of Bergen, State of New Jersey, as designated on a County plan entitled "Phase II River Road"; and

WHEREAS, the various projects and developments have been or are in the process of being designed and/or approved by the Bergen County Planning Board and Borough of Edgewater in connection with Phase II River Road; and

WHEREAS, said Bergen County approvals provide for certain work to be performed on portions of Phase II River Road, including the extension, realignment and

improvement of segments of same, as set forth on certain preliminary plans prepared by the County of Bergen; and

WHEREAS, the work for Phase II River Road is set forth in that certain Agreement dated November 1, 1996 between the Borough of Edgewater, County of Bergen and Edgewater Residential Community, L.L.C. ( hereinafter called "ERC"); and

WHEREAS, the project is known as New River Road (Phase II) and involves the construction and reconstruction and realignment along portions of existing River Road and the acquisition of certain other properties currently owned or under contract of purchase by ERC to facilitate the new alignment to construct and install other private and public facilities; and

WHEREAS, it has been determined by the respective governing bodies of the Borough of Edgewater and County of Bergen that portions of existing River Road and improvements thereon are unsightly and detrimental to the re-development of the area including, without limitation, areas at the intersection of River Road and Dempsey Avenue, areas in the vicinity of the post office Mail Bag Facility and areas in proximity to the former Alcoa plant and Binghamton Complex including on site conditions, its improvements, entrances and exits; and

WHEREAS, the execution of the  Phase II River Road plans involves participation and cooperation by the County of Bergen, the Borough of Edgewater and ERC to perform required work as set forth on the County Plans; and

WHEREAS, the Borough of Edgewater has by its Resolution dated August 12, 1996, approved and endorsed the conceptual County plan entitled "Phase II River Road" dated July 30, 1995, consisting of Sheets 1 through 4, for the redesigning and realignment

2

of a portion of River Road (Phase II) by the County of Bergen, which redesign and realignment is the subject matter hereof; and

**WHEREAS,** ERC has agreed to perform the work referred to in the Phase II River Road plans and in accordance with construction plans to be prepared by Boswell Engineering Co. ("the Boswell Plans"), such work commencing at the northerly property line of Hess Oil located on River Road north to and including its intersection with Route 5, extending to a point approximately sixty (60) feet north of said intersection, all of which work shall be completed in accordance with the Boswell Plans and specifications and approved by the County of Bergen; and

**WHEREAS,** in addition to the work set forth in the Tri-Parte Agreement between the Borough of Edgewater, County of Bergen and ERC, certain other work is deemed necessary by the County of Bergen to fully execute and safely implement the Phase II River Road plan including, without limitation:

a)   Road improvements per the Boswell Plans;

b)   Relocation of utilities, sewer, water, gas, electric;

c)   Traffic signalization, relocation and new installations;

d)   Demolish and removal and/or relocation of buildings and structures within or in close proximity of the proposed right of way of Phase II River Road;

e)   Removal, remediation, and abatement of conditions, structures or other improvements which, in the opinion of the County negatively impact on the efficient and safe movements of vehicular and pedestrian traffic on Phase I and Phase II River Road.

3

In connection with the above objectives and criteria, the County has taken into its planning consideration the public elementary school in close proximity to River Road and Russell Avenue, (the Alcoa property), as well as the residential areas surrounding same.

WHEREAS, ERC has agreed to acquire and convey or cause to be conveyed and dedicated for roadway purposes to the County of Bergen, by Deed of Easement and/or conveyance in fee, the right of way for road purposes as set forth in the Phase II River Road plans, to the following properties:

1. Lands comprised of the former Right of Way of the Susquehanna Railroad abutting the Binghamton Complex and the Alcoa Property ("A.P.") on both sides of Russell Avenue and existing River Road in the general vicinity of the Alcoa property ("A.P.") on River Road;

2. Lands comprised of the PMG Realty Associates, L.L.C. property, formerly known as the J. Fletcher Creamer Property, and access easement abutting existing River Road;

3. Lands comprised of the former Right of Way of the Susquehanna Railroad abutting the U.S. Postal Mail Bag Repair Facility and existing River road;

4. All right-of-way required through properties of the Borough of Edgewater, the current Municipal Parking Lot, the Department of Public Works Garage Property, the Ferry Plaza Building, the property owned by Ferry Bank Associates, L.P., property owned by Borough Associates, L.P. (formerly Ferry Plaza North), and



4

A&D Marine, Inc. and including the Route 5 River Road intersection and extending to a point approximately sixty (60) feet northerly of said intersection and as shown on the Phase II River Road plans; and

WHEREAS, certain properties required for the roadway improvement, as set forth on the Phase II River Road plans, are not under the control or current ownership of the County or ERC and require acquisition by the County, North River, or ERC respectively, and specifically property owned by A.P., also known as Alcoa property and buildings, the U.S. Postal Mail Bag Facility, and the Ferry Plaza Office and Retail Building; and

WHEREAS, ERC has agreed to contribute the sum of $3,852,698.00 to the Borough and County jointly toward the acquisition of such properties (excepting the A.P. property) and the construction of segments of the new roadway (Phase II River Road) and further to give the County an appropriate guarantee, Letter of Credit, Bond or similar security in form and content satisfactory to Bergen County Counsel, for the performance of the roadwork and ancillary work contemplated herein and set forth on the Phase II River Road plans and the Boswell Plans, drawings and specifications and approved by the County of Bergen; and

WHEREAS, the County, as a participant, agrees to contribute a total sum of $5,000,000 for the purposes of road construction and inspection, including the sum of $1,000,000 for such other public and private costs related to the acquisition, reconstruction and inspection of ancillary facilities of New River Road (Phase II) which funds shall be disbursed to the Borough and ERC for such use; and

5

WHEREAS, the road construction by ERC shall also include segments of New River Road (Phase II) extending from the Route 5/River Road intersection to an area at the property north of Hess Oil Co. and existing River Road, as set forth on the County plans and the Boswell construction plans and specifications; and

WHEREAS, the County has determined that the demolition and removal of the structures upon the A.P property are required for the efficient and safe movement of vehicular and pedestrian traffic, and said demolition and removal is in the best interest of the general public and region as a whole; and

WHEREAS, A.P. has agreed to pay RRIP, as set forth in this Agreement, for the demolition, removal and remediation of the structures on the A.P. property provided, however, that the funds shall be administered and disbursed by the County of Bergen, and provided further that said demolition, removal and remediation is supervised, inspected and guaranteed by the County of Bergen; and

WHEREAS, A.P. and the County, as a condition to said funding shall review and approve the demolition and remediation plan prepared by RRIP and approved by New Jersey Department of Environmental Protection ("DEP"), which shall, when completed and approved, provide and guarantee to A.P. and Alcoa the issuance of a No Further Action letter from DEP in form acceptable to A.P.

NOW, THEREFORE, in consideration of the premises and of such mutual promises, covenants and undertakings, the parties hereto agree as follows:

1.　　AP agrees to sell and North River agrees to buy that property located on River Road in the Borough of Edgewater known as the "Alcoa Property; as more fully described in the Purchase and Sale of Real Estate Agreement.

2.   North River and RRIP agree that they will cause to be demolished and removed from the AP property all structures and improvements currently existing on the property. Said demolition and removal shall be completed in accordance with the Remedial Action Workplan submitted to the DEP and the demolition plan reviewed and approved by AP.

3.   AP agrees to pay to RRIP the sum of $9,500,000 for the demolition and removal of the structures as described in paragraph 2 above. In addition, AP agrees to pay to RRIP costs of disposal of PCB-contaminated material (PCB concentrations greater than 50 ppm) at approved TSCA landfills, if those disposal costs exceed $250,000.00, up to a maximum of $2,500,000.00. AP's total liability for demolition of the structures and disposal of waste material will not exceed $12,000,000.00.

4.   The County shall supervise the demolition of the A.P. property and shall administer the disbursement of funds to RRIP with the funds provided to it by A.P. A.P., upon the execution of this Agreement, shall make an initial deposit with the County of Bergen in the sum of $2,000,000 to be disbursed in accordance with the terms of this Agreement. The RRIP shall make periodic requisitions for demolition, removal and the related work completed, and said requisitions shall be funded at a minimum of once per month, or more frequently as the approved demolition and removal schedule may require. Upon satisfactory monthly inspections, the County shall, upon notice to A.P., forthwith authorize the disbursement of funds to RRIP.

AP will provide additional funds to the County of Bergen in the amount of, and upon receipt of, approved requisitions from RRIP for work performed on the demolition

7

and removal of the structures. AP shall continue to provide funds to the County of Bergen until the County of Bergen has received sufficient funds to satisfy AP's liability to RRIP for the demolition and removal of the structures.



5.     The acquisition of the A.P. property and the demolition, removal and remediation of the A.P. (Alcoa) buildings and structures shall be performed at the same time as construction of New River Road (Phase II) which shall be performed by ERC or its agents, in accordance with the Boswell Plans and specifications.

6.     Upon commencement of the roadway construction and upon the request of Bergen County, A.P. and North River shall execute Deeds of Easement or fee title (at the County's option) and make such Right of Way dedications in favor of the County as may be required to implement the Phase II River Road plans in the general area of the A.P. property on existing River Road.

7.     It is the intent of the parties that the excess portions of land acquired by the County and purchased by North River or ERC shall be deeded and/or abandoned by the County to North River or ERC. All legal formalities to accomplish this will be implemented by the County in an expeditious manner.



8.     AP shall fund the demolition, removal and remediation . as set forth in paragraph 4 of this Agreement. The construction and reconstruction of segments of New River Road (Phase II) shall be the sole responsibility of ERC and the County jointly, pursuant to the Developer's Agreement dated November 1, 1996, as amended.

9.     RRIP shall deposit with the County of Bergen a Performance Bond or Letter of Credit in an amount over and above the estimated demolition costs of $12,000,000. Said bond of RRIP to the County of Bergen shall be in form approved by

Bergen County Counsel's office and it shall fully guarantee the demolition and removal costs of the A.P. buildings and structures in a manner and schedule previously approved by DEP, the County, and A.P.

10.    The County guarantees to AP that the demolition and removal of the AP structures and building will be completed as provided in the the Remedial Action Workplan and the approved demolition plan. This guarantee is effective and enforceable only if AP is not in default of its obligations set forth in paragraph 4 of this Agreement.

11.    The County of Bergen, RRIP and North River agree to re-use the rubble from the demolished structures that are not contaminated with PCB's greater than 50 ppm in accordance with applicable New Jersey laws.

12.    ERC agrees that portions of the various drainage facilities which are constructed within the areas adjacent to the County Road shall be conveyed to and become the property of the County, and the County may make such other drainage connections thereto as it may desire, provided that such other connections shall not interfere or negatively impact on proper drainage of the lands of the ERC.

13.    The County shall from time to time, but not less than two times per month, be responsible for the periodic inspection of the work performed by ERC and RRIP. All costs and expenses of such inspections shall be paid by RRIP and shall be over and above the estimated cost of demolition, removal and remediation of A.P. property. RRIP shall request inspections of completed work by the County at least five (5) days prior to disbursement of funds attributable thereto. The requisitions for payment of completed work shall be made by RRIP to the County with notice to A.P. Approval by the County shall be required prior to funding said requisition.

9

14. RRIP shall notify the DEP, County Department of Public Works and County Engineer, in writing, at least five (5) days prior to the commencement of any demolition, removal or remediation work affecting the A.P. property and, to the extent required, the commencement of construction of segments of (Phase II) New River Road at the intersection of Russell Avenue and River-Road.

15. Upon the execution of this Agreement by RRIP and the County, RRIP shall within thirty (30) days, furnish to the County, with a copy to A.P., the demolition, removal and remediation plans and schedules. Same are to be prepared by RRIP in conjunction with the approved environmental consultant and engineer. Said plans shall be approved by DEP, A.P. and the County.

16. It is understood and agreed that North River and RRIP shall defend and save the County and A.P. harmless from any and all claims that may be filed in any Court arising from the performance of this Agreement. In connection with the defense of any claim, the County and A.P. shall be entitled to select their own counsel. The County and A.P. shall fully cooperate in any such litigation provided, however, that neither the County nor A.P. shall be under any obligation to expend any funds for any purpose whatsoever in connection with such litigation. Should the County or A.P. be named as a party in any court, administrative or other action or proceeding, North River and RRIP agree to reimburse the County and/or A.P. (as applicable) for the cost of any legal, expert or other fees expended by the County and/or A.P. in such action or proceeding.

17. Incorporated herein and made a part hereof are the following documents:
a) the Developer's Agreement between ERC and Bergen County;

b) the Joint Reports, with reference to site plan nos. 2618 R-1 and 2366 R-1;

c) the Joint Report requirements of other developments which will participate in Phase II River Road reconstruction, including without limitation, A&D Marine, PMG Realty, L.L.C., Kings Ferry, Inc., Ferry Bank Associates, Borough Associates, L.P., North River Mews Residential Development (A.P.) and others, including the owners of property known as the U.S. Mail Bag and Ferry Plaza Building;

d) the Resolution of the Borough dated September 16, 1996, which authorizes, inter alia, the Borough's participation in Phase II and the commitment to promptly cooperate in the acquisition of properties necessary to complete Phase II River Road and the other improvements set forth on the County Plans;

e) the Boswell Plans approved by the County of Bergen identified as follows:

"River Road Improvements Phase II"
Construction Plans
Bergen County, Borough of Edgewater, New Jersey
Sheets 1 through 4
Job No. 96-215

as may be revised from time to time upon the mutual consent of the parties.

18.    This project involving the A.P. property, shall be designated, for all intents and purposes, as an element of a local governmental improvement project with North River, RRIP, and County as participants.

The County, ERC, and North River shall review and approve the Phase II River Road design by Boswell and shall obtain all approvals and permits required for the construction of the Phase II New River Road segment, and specifically permits from all utility companies involved or affected by the roadway improvements.

11

In this connection RRIP, as contractor, shall participate in and coordinate the efforts of the County and Borough of Edgewater with respect to the utility companies and any other permits or approvals which are required to demolish the A.P. buildings and structures and to construct New River Road Phase II segment.

20.    A.P. will cooperate with the County, its engineering consultants, and RRIP in overseeing the performance of the demolition, removal and remediation work.

21.    This Agreement shall be binding on the parties hereto and their heirs, executors, administrators, successors and assigns.

22.    All parties hereto have the requisite power and authority to enter into this Agreement and it is the intention of the parties to be bound by the terms hereof.  The execution and delivery of this Agreement is valid and binding upon the parties hereto and the genuineness of any and all corporate resolutions executed may be assumed to be genuine by the parties in receipt thereof.

23.    This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall constitute an original of this Agreement, but all such counterparts shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Witness:                                          A.P. NEW JERSEY, INC.

_____            By: _____

                                                  KEVIN L. MCKNIGHT,  Vice-President


Witness:                                          COUNTY OF BERGEN

*Carol Gurtel*                            By: _____

CAROL GURTEL                              WILLIAM P. SCHUBER
NOTARY PUBLIC OF NEW JERSEY              County Executive
My Commission Expires Aug. 11, 1998


Witness:                                          NORTH RIVER MEWS ASSOCIATES,
                                                  L.L.C.

_____            By: _____

                                                  North River Mews, Inc., Managing Member
                                                  FRED A. DAIBES, President


Witness:                                          RIVER ROAD IMPROVEMENT PHASE II,
                                                  INC.

_____            By: _____

                                                  FRED A. DAIBES, President


13

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year first above written.

Witness:

_____

Witness:

_____

Witness:

_____

Witness:

_____

A.P. NEW JERSEY, INC.

By: _____

KEVIN L. MCKNIGHT, Vice-President

COUNTY OF BERGEN

By: _____

WILLIAM P. SCHUBER
County Executive

NORTH RIVER MEWS ASSOCIATES,
L.L.C.

By: _____

North River Mews, Inc., Managing Member
FRED A. DAIBES, President

RIVER ROAD IMPROVEMENT PHASE II,
INC.

By: _____

FRED A. DAIBES, President

13

STATE OF NEW JERSEY        )
                          )        :SS
COUNTY OF BERGEN          )

**BE IT REMEMBERED** that on this 24th day of June _____,

1997, before me the subscriber, A NOTARY PUBLIC _____ of the State of New Jersey,

personally appeared/who being by me duly sworn, did depose and make proof to my

satisfaction that he is the County/Executive _____ of the County of Bergen, a Body Politic

and Corporate of the State of New Jersey; that xxxxzxzxzxzxzxz is the

xzxzxzzzxzxzxzxxzzzxzxxzzzx of said County of Bergen; that the execution, as well

as the making of this Instrument has been duly authorized by a proper Resolution of the

Board of Chosen Freeholders of the County of Bergen; that deponent well knows that

corporate seal of said County of Bergen; and that the seal affixed to said Instrument is

such corporate seal and by the said William P. Schuber, as and for his voluntary

act and deed and as and for the voluntary act and deed of the said County of Bergen.

Sworn and subscribed to before me
this 24 day of June _____, 1997

_____
Carol Gurtel

**CAROL GURTEL**
**NOTARY PUBLIC OF NEW JERSEY**
My Commission Expires Aug. 11, 1998

14

STATE OF NEW JERSEY          )
                            )        :SS
COUNTY OF BERGEN             )

    **BE IT REMEMBERED** that on this _____ day of _____,

1997, before me the subscriber, Kevin L. McKnight of the Commonwealth of

Pennsylvania, personally appeared who being by me duly sworn, did depose and make

proof to my satisfaction that he is the Vice-President of A.P. NEW JERSEY, INC., the

Corporation named in the within instrument;

  that the execution, as well as the making of this instrument has been duly authorized by a

proper Resolution of the Board of Directors of said Corporation; and that the seal affixed

to said instrument signed and delivered by said President as for the voluntary act and

deed of said Corporation, in presence of deponent, who thereupon subscribed his name

thereto as attesting witness.

                **A.P. NEW JERSEY, INC.**

                _____

                    Kevin L. McKnight

Sworn and subscribed to before me
this _____ day of _____, 1997

_____

15

STATE OF NEW JERSEY          )
                             )          :SS
COUNTY OF BERGEN             )

BE IT REMEMBERED that on this 4th day of July 1997, before me the subscriber, *~signature~* of the State of New Jersey, personally appeared *~signature~* who being by me duly sworn, did depose and make proof to my satisfaction that he is the *~Secretary~* of RIVER ROAD IMPROVEMENT PHASE II, INC., the Corporation named in the within instrument; that *~signature~* is the President of said Corporation; that the execution, as well as the making of this instrument has been duly authorized by a proper Resolution of the Board of Directors of said Corporation; and that the seal affixed to said instrument signed and delivered by said President as for the voluntary act and deed of said Corporation, in presence of deponent, who thereupon subscribed his name thereto as attesting witness.

RIVER ROAD IMPROVEMENT PHASE II, INC.

Sworn and subscribed to before me
this 4th day of July, 1997

*~signature~* An Attorney at Law of NJ

16

STATE OF NEW JERSEY      )
                          )     :SS

COUNTY OF BERGEN      )

BE IT REMEMBERED that on this ___ day of _____

1997, before me the subscriber, _____ of the State of New Jersey,

personally appeared who being by me duly sworn, did depose and make proof to my

satisfaction that he is the Managing Member of NORTH RIVER MEWS ASSOCIATES,

L.L.C., the Corporation named in the within instrument;

that the execution, as well as the making of this instrument has been duly authorized by a

proper Resolution of the Board of Directors of said Corporation; and that the seal affixed

to said instrument signed and delivered by said President as for the voluntary act and

deed of said Corporation, in presence of deponent, who thereupon subscribed his name

thereto as attesting witness.

                                     NORTH RIVER MEWS ASSOCIATES, L.L.C.

Sworn and subscribed to before me
this ___ day of _____, 1997

17

Do We need these???

## EXHIBITS

1. Bergen County Planning Board Application No. SP2618R-1

2. Bergen County Planning Board Application No. SP2366R-1

3. Borough of Edgewater Resolution No. R195-96

4. River Road Phase II Edgewater Plans, Drawings 1 through 4

5. No Further Action Letter (Form) - New Jersey Department of Environmental Protection

18

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement in duplicate as of the day and year first above written.

WITNESS:

By: _Arthur Grayfankel_

A. P. NEW JERSEY, INC.

By: _____

Its: _Vice-President_

# EXHIBIT B

# AGREEMENT TO PURCHASE AND SELL REAL ESTATE

THIS AGREEMENT TO PURCHASE AND SELL REAL ESTATE (this "Agreement") is made and entered into as of the _____ day of June, 1997, by and between **A. P. NEW JERSEY, INC.**, a Delaware corporation with a place of business at 1501 Alcoa Building, 425 Sixth Avenue, Pittsburgh, Pennsylvania 15219 ("Seller"), and **NORTH RIVER MEWS ASSOCIATES, LLC**, a New Jersey limited liability company with a place of business c/o Mr. John De Sheplo, Esquire, 260 Columbia Avenue, Fort Lee, New Jersey 07024 ("Buyer").

1.     **Purchase And Sale.**  Seller agrees to sell, transfer, and convey to Buyer, and Buyer agrees to purchase from Seller, upon the terms, provisions and conditions hereinafter set forth those certain tracts, lots or parcels of real property situated in the Borough of Edgewater, County of Bergen and State of New Jersey, described in Exhibit A attached hereto and incorporated herein by reference (collectively, the "Property").

2.     **Purchase Price.**  The purchase price which Seller agrees to accept for the Property and which Buyer agrees to pay therefor shall be a minimum of $8,000,000, and shall increase by $20,000 for each unit approved for construction on the Property in excess of 400 units (the "Purchase Price").  The Purchase Price shall be payable as follows:

(a)     At the Closing (defined below), Buyer shall deliver to Seller:

(i)     Buyer's fully executed unconditional promissory note (the "Note"), secured by Buyer's mortgage to the Property (the "Mortgage"), in the principal amount of the Purchase Price less $2,000,000, for a term of eighteen (18) months from the Closing Date and with an annual interest rate of 6% accruing until fully satisfied, substantially in the form and substance attached hereto as Exhibits B and C, respectively.  Upon maturity of the Note, Buyer shall pay to Seller the amount of the Note, principal plus interest, by wire transfer in immediately available funds to the following account (the "Mellon Account"):

Mellon Bank NA, Pittsburgh, PA
ABA #043 000 261
Account Number: #000-1206
Account Name: Aluminum Company of America;

(ii)     An irrevocable, unconditional letter of credit (the "Letter of Credit") issued by PNC Bank, or a reputable commercial bank, savings bank or savings and loan association acceptable to Seller, to the benefit of Seller in the amount of $2,000,000, with an expiration date of not earlier than twenty-four (24) months after the Closing, in a form acceptable to Seller.  The Letter of Credit shall be payable upon presentation of Seller's sight draft dated 18 months from the date of the Closing or upon presentation of Seller's sight draft dated earlier than 18 months from the date of the Closing accompanied by Seller's notarized written statement as follows: "North River Mews Associates, LLC is in

default of its obligations under a certain Agreement to Purchase and Sell Real Estate dated June ___, 1997 (the "Agreement"), with the undersigned, as Seller, and such default has not been cured in accordance with paragraph 8(b) of the Agreement.

(b)     Payment for Additional Units.  In the event Buyer, or anyone who acquires title to the Property or any part thereof from Buyer, receives approval to construct more than 400 units at the Property during the time period from May 1, 1997 through May 1, 2117, then at Closing, or within 15 days of receiving such approval, Buyer shall notify Seller of such approval and, within two (2) days following receipt of a building permit to construct the additional units shall pay to the Mellon Account, by wire transfer in immediately available funds, the amount of $20,000 for each additional unit for which approval was granted.

(i)  Covenant.  This Section 2(b) shall be a covenant running with the land, and shall be recorded in the form of a Memorandum of Agreement with the Deed. Any subsequent transfer of the property is subject to Section 2(b), and Section 2(b) shall not merge with and into the Deed on Closing.

(ii)  Estoppel Certificate.  From time to time, upon Buyer's request, Seller shall execute an estoppel certificate in a form reasonably acceptable to Buyer stating that Buyer is not in default of Section 2(b).

3.     Instruments Of Transfer.  At the Closing, Seller shall convey title to the Property to Buyer by Seller's warranty deed with covenant against grantor's acts (the "Deed") and Seller and Buyer shall execute and deliver to the other, and, where applicable, file and record such instruments of conveyance, transfer and assignment, as shall be necessary or appropriate in the opinion of their respective counsel or as required by the Title Company (defined below) to transfer to Buyer all of the aforesaid right, title and interest of Seller in the Property pursuant to this Agreement.

4.     Title Matters.

(a) Title Commitment.  Seller shall, at its sole cost and expense, as soon as reasonably possible following the execution of this Agreement, cause Chicago Title and Insurance Company (the "Title Company") to issue its commitment for an owner's fee policy of title insurance for the Property in the amount of the purchase price and designating Buyer as the proposed insured (the "Commitment").  Buyer shall, within fifteen (15) days after receipt of the Commitment, either:

(i)   Approve the form and substance of the Commitment; or

(ii)   Notify Seller in writing (the "Notice") to remove or satisfy any reasonable matters relating to the title or interests which are objectionable to Buyer as shown on the Commitment.  Seller shall have ninety (90) days following the receipt of the Notice to correct those objections specified in the Notice.  In the event that Seller is unwilling or unable to correct such objections, then, as Buyer's sole remedy and at Buyer's option to be exercised by written notice within thirty (30) days following the expiration of such 90-

2.



day period, either accept such title and interest as Seller is able to furnish without reduction in or abatement of the Purchase Price and without liability of Seller to Buyer or terminate this Agreement. Upon such termination, neither party hereto shall thereafter have any further liability or obligation to the other party hereunder. Unless Buyer objects to the title condition and terminates this Agreement, said title condition shall be deemed to be acceptable and any objection to the condition shall be deemed to have been waived by Buyer for all purposes.

(b) Survey. Seller shall cause to be prepared an ALTA survey of the Property from a New Jersey licensed surveyor sufficient to delete the survey exception from the Commitment. The cost of the Survey shall be borne by Seller unless this Agreement is terminated before Closing, in which case the cost of the Survey shall be borne by Buyer.

(c) Title Insurance. Buyer shall bear the cost of the Policy of Title Insurance.

5.      Warranties and Representations.

(a)     Litigation and Claims. Except as set forth on Schedule 5(a), to Seller's knowledge there are no legal actions, suits, arbitrations or other legal, administrative or governmental proceedings pending or threatened against Seller which would materially adversely affect the condition or ability to use the Property as contemplated by this Agreement, nor is Seller aware of any basis for the foregoing.

(b)     OTHER THAN THE REPRESENTATION AND WARRANTY SET FORTH IN THIS SECTION, BUYER SPECIFICALLY ACKNOWLEDGES THAT SELLER IS SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "AS IS, WITH ALL FAULTS" BASIS AND THAT BUYER SHALL HAVE AN OPPORTUNITY TO INSPECT THE PROPERTY AND IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE PROPERTY, INCLUDING WITHOUT LIMITATION:

(i)     the quality, nature, adequacy and physical condition of the Property, including, but not limited to, the structural elements, foundations, roofs, floors, appurtenances, access, landscaping, parking facilities, and the electrical, mechanical, HVAC, plumbing, sewage, and utility systems, facilities and appliances;

(ii)    the quality, nature, adequacy, and physical condition of soils, geology and any groundwater;

(iii)   the existence, quality, nature, adequacy and physical condition of the Property;

(iv)    the development potential of the Property, and the Property's use, habitability, merchantability, or fitness, suitability, value, or adequacy of the Property for any particular purpose;

3.

(v)   the zoning or other legal status of the Property or any other public or private restrictions on use of the Property;

(vi)   the compliance of the Property or its operation with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or quasi-governmental entity or of any other person or entity;

(vii)   the presence or removal of hazardous or toxic materials, substances or wastes in, on, under, or about the Property or the adjoining or neighboring property;

(viii)   the quality of any labor and materials used in any improvements on the Property;

(ix)   subject to Section 4 hereof, the condition of title to the Property, other than those representations and warranties, if any, contained in the Deed by operation of law;

(x)   the leases, service contracts, or other agreements affecting the Property; and

(xi)   the economics of the operation of the Property.


6.   **Conditions Precedent To Closing.**

(a)   <u>Buyer's and Seller's Conditions.</u>  Unless all of the following conditions are satisfied, Buyer shall not be obligated to purchase, and Seller shall not be obligated to sell, convey, or transfer, the Property (except as such conditions may hereafter be expressly waived by Buyer and Seller in writing):

(i)   The New Jersey Department of Environmental Protection ("NJDEP") shall have executed and issued a Memorandum of Agreement providing for the issuance of a "No Further Action" letter substantially in the form and substance attached hereto as Exhibits D and E, respectively.

(ii)   Seller, Buyer, River Road Improvement Phase II, Inc. and the County of Bergen, New Jersey, shall have entered into a Multi Party Property Acquisition Agreement substantially in the form and substance attached hereto as Exhibit F (the "Multi-Party Agreement").  The Multi-Party Agreement, once fully executed, shall be incorporated into this Agreement by reference and attached as Exhibit G.  The Multi Party Agreement shall contain provisions for:

(1)   the requirement to demolish the structures on the Property in accordance with a Remedial Action Work Plan submitted to the NJDEP by River Road Improvement Phase II, Inc. (the "Demolition");

4.

(2)    the requirements that: (i) Seller will be responsible for payment of Demolition costs in the Amount of $9,500,000, (ii) Seller will be responsible for costs of disposal of material contaminated with PCB's at concentrations greater than 50 ppm at approved TSCA landfills if those disposal costs exceed $250,000 up to a maximum of $2,500,000, and (iii) Seller's total liability for Demolition and disposal of waste material will not exceed $12,000,000; and

(3)    the establishment of an acceptable funding mechanism for the Demolition.

(b)    Buyer's Conditions.  Unless all of the following conditions are satisfied, Buyer shall not be obligated to purchase the Property (except as such conditions may hereafter be expressly waived in writing by Buyer):

(i)    Buyer shall have received the necessary, final, non-appealable approvals of its development plans for the Property from the Borough of Edgewater, New Jersey. Seller agrees to execute all required consents to enable Buyer to meet this condition and all other requisite approvals; and

(ii)    From the date of this Agreement until the Closing, there shall not have occurred any material adverse change in the physical condition of the Property or the condition of title to the Property.

(c)    Seller's Conditions.  Unless all of the following conditions are satisfied, Seller shall not be obligated to sell, convey, and transfer the Property to Buyer (except as such conditions may hereafter be expressly waived in writing by Seller):

(i)    Seller shall have received from the County of Bergen, New Jersey, a guarantee of performance acceptable to Seller for the Demolition.

7.    **Environmental Conditions.**  The following terms and conditions shall survive Closing hereunder and shall not be merged with and into the Deed.

(a)    Hazardous Substance.  For the purposes hereof, the term "Hazardous Substance" shall mean any substance, chemical or waste that is listed or defined as hazardous, toxic, or dangerous under Applicable Law (defined below), and any asbestos containing materials, radioactive materials or petroleum products.

(b)    Applicable Law.  For the purposes hereof, the term "Applicable Law" shall mean the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq.; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.; the Clean Air Act, 42 U.S.C. §§ 7401, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1471 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; and the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; each as amended from time to time, together with the rules and regulations promulgated thereunder, and any and all formal or

-5-



informal orders, decrees or requests from the United States Environmental Protection Agency, the appropriate New Jersey state governmental and regulatory bodies, or any other governmental agency, authority or instrumentality having jurisdiction and any similar state and local laws and ordinances and the regulations implementing such statutes; together with any and all federal, state, and local environmental or land use laws, rules, ordinances, or regulations.

(c)     Environmental Reports.  Seller shall make available to Buyer the reports listed on Schedule 7(c), attached hereto and incorporated by reference, concerning the environmental condition of and contamination in, on, under, or about the Property (the "Environmental Reports").  The parties agree that the Environmental Reports and any and all reports, analyses, surveys, assessments, evaluations or the like prepared by Buyer and its representatives pursuant to Section 7(d) will establish the known environmental condition of the Property as of the Closing Date.  The Environmental Reports, and any and all reports, surveys and assessments, including all copies thereof, produced by Buyer or its representatives pursuant to this Agreement, shall be held in strict confidence by Buyer and shall not be disclosed by Buyer or its employees, consultants, agents and representatives, without the prior written consent of Seller.

(d)     Buyer's Assessment.  Buyer, at its sole cost and expense, may conduct an environmental transfer assessment of the Property prior to Closing ("Buyer's Assessment").  Seller shall permit Buyer or its representatives, at all reasonable times prior to the Closing Date, to enter upon any and all of the Property for the purposes of inspection, making tests, taking samples and soil borings, and/or conducting groundwater studies and such other investigations as Buyer shall deem appropriate, in order to complete Buyer's Assessment.

(e)     Restrictions on Buyer's Assessment.  Notwithstanding any other provision of this Agreement, Buyer's right to enter the Property for purposes of conducting Buyer's Assessment shall be subject to the following restrictions:

(i)     Buyer shall notify Seller at least twenty-four (24) hours prior to entry onto the Property to conduct such activity;

(ii)     All activities undertaken in connection with Buyer's Assessment shall fully comply with any Applicable Law, and other laws relating to worker safety and to proper disposal of any samples taken, and any soil or water generated in the process of taking the samples, and Buyer shall provide Seller with split samples of all soil, air or water sample so taken;

(iii)     Seller shall be permitted to have a representative present during all such investigations, and copy the results of on-site testing and visual inspections, and shall have complete access to all samples taken, test results, and boring records; 

(iv)     In the event that Buyer shall not consummate this transaction for any reason, Buyer shall restore the Property to its condition prior to such investigative activities;

(v)     Buyer shall take all actions and implement all protections necessary to ensure that actions taken hereunder and equipment, materials, and substances generated, used or brought onto the Property pose no threat to the safety or health of persons or the environment, and cause no damage to the Property of Seller or of any other person;

(vi)    Buyer shall be solely responsible for the security of the activities, equipment and materials brought on the Property prior to the Closing Date;

(vii)   Buyer for itself, its successors and assigns, covenants and agrees that it shall indemnify and save harmless Seller, its successors and assigns, from and against any and all loss or liability, and all claims, damages, fees, costs and expenses resulting from, incident to or in any way arising out of the entry onto the Property to conduct Buyer's Assessment, or any other act done pursuant to the rights, privileges and authority hereby granted. Buyer shall reimburse Seller for actual damage to the Property resulting from said activities.

(viii)  Unless specifically required by New Jersey law, any and all reports, surveys and assessments, including all copies thereof, produced by Buyer or its representatives pursuant to this Agreement shall be held in strict confidence by Buyer, shall not be disclosed by Buyer or its employees, consultants, agents and representatives, without the prior written consent of Seller, and shall be forthwith delivered to Seller at no cost or expense to Seller;

(ix)    Without limiting the effect of the last clause, Buyer shall require that any party performing services hereunder waive all rights to assert any lien or claim against Seller or the Property arising out of services performed hereunder and provide insurance against injury and damage to Seller or any other person, in coverage amounts and terms satisfactory to Seller, and shall obtain Seller's written approval of such coverage prior to that party's first entry onto the Property; and

(x)     Buyer and its representatives shall comply with all governmental laws and regulations and all policies and regulations of Seller in effect at such time, including, but not limited to, those relating to health and safety, and with such special regulations, rules or policies as may be considered appropriate by Seller under the circumstances and Seller shall have the right to refuse initial or continued access to the Property to any person when it determines that such action is necessary or desirable.

(f)     <u>Indemnification of Seller</u>.  Buyer shall indemnify, defend and hold Seller harmless from any and all claims, demands, causes of action, and suit or suits, including all foreseeable and unforeseeable consequential damages, occurring on or after the Closing Date arising under Applicable Law related to Buyer's (or, during Buyer's ownership of the Property, any operators' or any third parties') use of the Property and/or any and all activities relating thereto.

(g)     <u>Release of Seller</u>.  Except in the event that Seller remains in default on any payment obligation after receiving notice of such default and opportunity to cure as set forth in Section 8, Buyer expressly releases Seller and agrees to waive all rights that it may have to seek

7



contribution from Seller for any response costs or claims that may arise as a result of the actions or inactions of Seller and any previous owner, operator or third party on or with respect to the Property relating to Hazardous Substances. Nothing in this provision shall alter or expand the parties' rights or obligations under the Multi Party Agreement.

8.    **Default.**

(a)    <u>By Seller</u>.  If Seller fails to perform any of its obligations under this Agreement or the Multi Party Agreement, the same shall constitute a default of this Agreement and thereupon Buyer, at its option, may declare a forfeiture by written notice to Seller ("Notice of Seller's Default").  At the expiration of forty-five (45) days after the Notice of Seller's Default, if Seller has not remedied the default, or if Seller has not exercised all efforts to remedy the default as quickly as possible where the default is not capable of being remedied in forty-five (45) days, Buyer may declare this Agreement null and void.  In any event, if such default is not remedied within 120 days after the Notice of Seller's Default, Buyer may declare this Agreement null and void.

(b)    <u>By Buyer</u>.  If Buyer fails to perform any of its obligations under this Agreement or the Multi Party Agreement, the same shall constitute a default of this Agreement and thereupon Seller, at its option, may declare a forfeiture by written notice to Buyer ("Notice of Buyer's Default").  At the expiration of forty-five (45) days after the Notice of Buyer's Default, if Buyer has not remedied the default, or if Buyer has not exercised all efforts to remedy the default as quickly as possible where the default is not capable of being remedied in forty-five (45) days (an "Extended Default"), Seller may at its option:

(i)    if the default occurs before Closing and is not cured as described in Section 8(b), declare the Agreement null and void; or

(ii)    if the default occurs after Closing and Seller is not in default, upon thirty (30) days' written notice, demand immediate payment of the Note and/or Letter of Credit or immediately foreclose on the Mortgage.

In any event, if an Extended Default is not remedied within 120 days after the Notice of Buyer's Default, Seller may elect to exercise its remedies under this Section 8(b)(i) or (ii).

(c)    <u>Limitation of Liability</u>.  In the event of default under this Agreement, the remedies of the parties are limited to the remedies set forth in Sections 8(a) and (b) above.  No party shall be liable for any incidental or consequential damages for default under this Agreement.

(d)    <u>Waiver of Breach</u>.  The waiver by either party of any condition or breach by the other party of any term, covenant, or condition herein contained shall not be deemed to be a waiver of any other condition of any subsequent breach of the same or any other term, covenant, or condition herein contained.



9.    **Force Majeure.**

(a)    "Force Majeure" shall mean an act, event or condition having a material adverse effect upon the rights or obligations of either party hereunder if such act, event, or condition is beyond the reasonable control of the parties to this Agreement and is relied upon as justification for the failure to perform any obligation set forth herein or to comply with any condition required of the respective parties pursuant to this Agreement. Such acts, events or conditions shall be limited to the following: (i) any labor strike or interruption, or (ii) the action or inaction of any governmental body of the United States of America or the State of New Jersey and any other subdivisions thereof exercising jurisdiction.

(b)    Each party hereto is excused from failure or delay in the performance of any act required hereunder (except for payment of the Letter of Credit, accrual and payment of interest on the Note, and Seller's payment obligations with respect to the Demolition) by reason of Force Majeure. In the event a party is rendered unable, either in whole or in part, to carry out the terms of this Agreement, such affected party shall give immediate notice ("Force Majeure Notice") to the other party and the obligations (other than payment of the Letter of Credit, accrual and payment of interest on the Note, and Seller's payment obligations with respect to the Demolition) of such affected party, to the extent affected by such Force Majeure and to the extent that due diligence is being used to resume performance at the earliest practicable date, shall be suspended. The parties hereto shall use their best efforts to overcome or remove any Force Majeure and to minimize the effect of such Fore Majeure. Notice shall be given to the other party when the effect of the Force Majeure has ceased. The parties hereto acknowledge that notwithstanding any Force Majeure, all payment obligations shall continue to be performed without delay, including but not limited to the payment of the Letter of Credit and the Note.

(c)    If any event of Force Majeure claimed by a party is not overcome or removed within two (2) years of the Force Majeure Notice being given, then at the option of the other party, upon ten (10) days' written notice, this Agreement shall be null and void.

9.    **Closing.**

(a)    Date and Location. The purchase and sale transaction contemplated by this Agreement shall close (the "Closing") on or before October 31, 1997, or on such other date as the parties may otherwise mutually agree (the "Closing Date"); provided, however, that the Closing Date shall not be later than December 31, 1997. The Closing shall be held at a location which is mutually agreeable to both parties.

(b)    Seller's Obligations. At the Closing, Seller shall:

(i)    Deliver to Buyer a duly executed and acknowledged deed in substantially the form and substance as Exhibit H, attached hereto (the "Deed");

(ii)    Deliver to Buyer a duly executed Affidavit of Title in substantially the form and substance as Exhibit I attached hereto;

(iii)    Deliver to Buyer possession of the Property;

9

(iv)    Deliver to Buyer reasonable evidence of Seller's capacity and authority for closing the transaction as required by the Title Company;

(v)    Deliver documents reasonably requested by the Title Company as administrative requirements for closing this transaction, including but not limited to an ALTA survey; and

(vi)    Deliver to Buyer an Owner's Policy of Title Insurance in the amount of the Purchase Price, dated as of the Closing Date.

(c)    <u>Buyer's Obligations</u>.  At the Closing, Buyer shall:

(i)    Deliver to Seller the Note, Mortgage and Letter of Credit.  Buyer shall pay to Seller the cost of the Policy of Title Insurance and the title search:

(ii)    Deliver to Seller reasonable evidence of Buyer's capacity and authority for closing the transaction; and

(iii)    Deliver documents reasonably requested by the Title Company as administrative requirements for closing this transaction.

(d)    <u>Taxes</u>.  General real estate taxes for the then-current year relating to the Property shall be prorated as of the Closing Date and shall be adjusted in cash at Closing.  If the Closing shall occur before the tax rate is fixed for the then current year, the apportionment of taxes shall be upon the basis of the tax rate for the next preceding year applied to the latest assessed valuation.  All special taxes or assessments prior to the Closing Date shall be paid by Seller.  Any rebates or refunds of taxes paid prior to Closing shall be for Seller's benefit.  Seller shall pay all transfer tax on the Property that becomes due as a result of the transactions contemplated by this Agreement.

(e)    <u>Costs</u>.  Except to the extent specifically allocated in this Agreement, each party shall pay its share of the normal and incidental costs associated with the Closing which are routinely incurred by a Seller and Buyer in a transaction of this character in the county where the Property is located.

10.    <u>Risk Of Loss; Condemnation</u>.  Seller shall assume the risk of loss, destruction or damage to the Property by fire, Act of God, other casualty, or condemnation prior to the Closing Date and the transfer of title to the Property to Buyer.  Buyer assumes, as of the Closing Date and transfer of title, all hazards of damage to or destruction of the Property and of the taking of the Property or any part thereof for public use, and agrees that no such damage, destruction or taking shall constitute a failure of consideration.  Upon the execution of this Agreement, Buyer shall have an insurable interest in the Property.

11.    **Brokers.** Seller and Buyer each represent and warrant to the other that no real estate brokers or finders are or were involved with respect to any of the transactions contemplated by this Agreement. Each party hereto will indemnify and save harmless the other from any claim or claims made by any brokers or finders for any commissions or compensation alleged to be due by reason of the indemnifying party involving such brokers or finders.

12.    **Notices.** All notices, demands, elections, requests, consents and other communications hereunder shall be in writing and shall be given by personal delivery or sent by certified or registered mail, postage prepaid, return receipt requested and addressed to the parties hereto at the addresses below, or sent by facsimile to the parties at the facsimile numbers below, or at such other address or facsimile number as a party may designate:

Seller

Attention:    Mgr. - Corporate Real Estate
2109 Alcoa Building
425 Sixth Avenue
Pittsburgh, PA 15219
Facsimile No.: (412) 553-2661
Telephone No.: (412) 553-2614

Buyer
Attention:    Mr. John De Sheplo
260 Columbia Aveune
Fort Lee, NJ 07024
Facsimile No.: (201) 224-0572
Telephone No.: (201) 224-6679

Mr. Fred Daibes
725 River Road
Edgewater, NJ 07020
Facsimile No.: (201) 313-9044
Telephone No.: (201) 224-0003

with copy to: David Carmel, Esquire
523 River Road
Edgewater, NJ 07020
Facsimile No.: (201) 943-5614
Telephone No.: (201) 943-9160

13.    **Non-Foreign Person.**

(a)    Seller's Certification.    Seller certifies and affirms that Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1954, as amended. Seller will execute at or prior to the Closing Date such appropriate affidavit or affidavits as may

11

be necessary to evidence same in accordance with Treasury Department Regulation 1.1445-2T(b)(2)(iii).

(b)   Buyer's Certification.  Buyer certifies and affirms that Buyer is not a "foreign person" within the meaning of the federal International Investment Survey Act of 1976, as amended, 22 U.S.C. §3101, et seq.  Buyer will execute at or prior to the Closing Date such appropriate affidavit or affidavits as may be necessary to evidence the same.

14.   Like-Kind Exchange.  Seller may transfer or convey the Property to Buyer as a like-kind exchange pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, through the use of a qualified intermediary; provided that the like-kind exchange does not delay Closing or affect any obligation or requirement of this Agreement, that certain Agreement to Purchase and Sell Real Estate between the parties related to the parking lot ("Parking Lot Agreement") or the Multi Party Agreement.  If Seller elects, in its sole discretion, to convey or transfer the Property pursuant to such a like-kind exchange, Buyer shall cooperate with Seller in good faith to effect such exchange.  Buyer shall not incur any additional costs as a result of Seller's election to convey or transfer the Property pursuant to a like-kind exchange.

15.   Headings.  The headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation of this Agreement.

16.   Merger.  All understandings and agreements heretofore had between the parties, oral or written, are merged into this Agreement, which alone fully and completely expresses their understanding.

17.   Modification.  This Agreement shall not be modified or amended except by a written instrument duly executed by the parties hereto.

18.   Binding Effect And Assignment.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto.  Neither party shall assign this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld.  Any attempted assignment without such prior written consent shall be void.

19.   Governing Law.  This Agreement shall be construed and governed in accordance with the laws of the State of New Jersey.

20.   Prohibition Against Recording.  Neither Buyer nor Seller shall cause this Agreement, nor any part or memorandum thereof, to be placed or filed of record.

12

21.    **Modified Time Of The Essence.**  If full performance of this Agreement is not completed by the Closing Date, either party shall have the right thereafter to declare time to be of the essence of this Agreement by giving written notice thereof to the other party.  Such notice shall contain a declaration that time is of the essence and shall fix the time, place and date of final settlement, which date may not be sooner than thirty (30) days following the effective date of such notice.

22.    **Survival.**  Sections 2(b),  5, 7 and 8 shall survive the Closing and the consummation of the transaction contemplated by this Agreement.

23.    **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall constitute an original of this Agreement, but all such counterparts shall constitute one and the same instrument.

13.

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement in duplicate as of the day and year first above written.

WITNESS:

SELLER:
A. P. NEW JERSEY, INC.

By: _____

By: _____

Its: _____

WITNESS:

BUYER:
NORTH RIVER MEWS ASSOCIATES, LLC

By: _____

By: _____
North River Mews, Inc., Managing Member
Fred A. Daibes, President

14.

_IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement in duplicate as of the day and year first above written.

WITNESS:

By: _____

SELLER:
A. P. NEW JERSEY, INC.

By: _____

Its: _Vice - President_

Schedule 5(a)

Litigation

Complaint filed in Tax Court of New Jersey contesting 1997 real property tax assessments on 700 River Road, Block 74, Lot 1 and 732 River Road, Block 71, Lot 2.



SCHEDULE 7C

ENVIRONMENTAL REPORTS

Renaissance Square, Edgewater, New Jersey - Appendix G - General Site PCB-Contamination Characterization (includes Exhibit 1, 2 and 3) prepared by Paulus Sokolowski and Sartor Inc. dated September 1986.

Remedial Investigation/Feasibility Study - Former Alcoa Aluminum Works, Edgewater, New Jersey, Volume 1 prepared for Amland Properties Corporation by Woodward-Clyde Consultants dated November 1988.

Remedial Investigation/Feasibility Study - Former Alcoa Aluminum Works, Edgewater, New Jersey, Volume 2 Appendices A-F, prepared for Amland Properties Corporation by Woodward-Clyde Consultants dated November 1988.

Remedial Investigation/Feasibility Study - Former Alcoa Aluminum Works, Edgewater, New Jersey, Volume 3 Appendices G-I, prepared for Amland Properties Corporation by Woodward-Clyde Consultants dated November 1988.

Interim Response Action Final Report - A.P. New Jersey, Inc. - prepared by Metcalf & Eddy, Inc. dated September 1993.

Detailed Options Evaluation Report - Aluminum Company of America - Edgewater, New Jersey (DERS Project No. 3589) prepared by DuPont Environmental Remediation Services dated July 11, 1996.

## EXHIBIT "A"

THE PROPERTY to be conveyed shall consist of all those parcels of land and premises situate, lying and being in the Borough of Edgewater in the County of Bergen and State of New Jersey, more particularly described as follows:

## PARCEL A

BEGINNING at the intersection of the Southerly line of Russell Avenue and the Westerly line of River Road; thence

(1)   Along the Westerly line of River Road South 21 degrees 41' 51" West a distance of 84.55 feet to a point; thence

(2)   Along the Westerly line of River Road South 20 degrees 58' 51" West a distance of 132.06 feet to a point; thence

(3)   Along the Westerly line of River Road forming a curve to the right with a radius of 283.97 feet (or 300.47 feet as the case may be) and an arc distance of 98.13 feet to a point; thence

(4)   Along the Westerly line of River Road South 40 degrees 46' 51" West a distance of 154.71 feet to a point; thence

(5)   Along the Westerly line of River Road South 40 degrees 43' 51" West a distance of 213.02 feet to a point; thence

(6)   Along the Westerly line of River Road South 37 degrees 05' 21" West 157.71, to a spike in the pavement at the intersection of the Westerly line of River Road and the Northerly line of Vreeland Terrace; thence

(7)   Along the Northerly line of Vreeland Terrace North 53 degrees 38' 09" West a distance of 463.00 feet to the Easterly line of Undercliff Avenue; thence

(8)   Along the Easterly line of Undercliff Avenue North 23 degrees 23' 51" East a distance of 162.02 feet to a point; thence

(9)   Along the Easterly line of Undercliff Avenue North 27 degrees 21' 56" East 204.30 feet to a point; thence

(10)  Along the Easterly line of Undercliff Avenue North 27 degrees 38' 51" East 463.84 feet to a point on the Southerly line of Russell Avenue; thence

(11)  Along the Southerly line of Russell Avenue South 54 degrees 54' 09" East a distance of 566.09 feet to the point and place of beginning.

EXCEPTING, however, from the above described parcel all that parcel of land known as The Edgewater Cemetery and bounded and described as follows:

BEGINNING at a point which point is North 23 degrees 00' 16" East a distance of 161.72 feet from the intersection of the Westerly line of River Road with the Northerly line of Vreeland Terrace; thence

(1)  Parallel with the Northerly line of Vreeland Terrace North 53 degrees 38' 09" West a distance of 340.63 feet to a point; thence

(2)  North 35 degrees 08' 31" East a distance of 185.11 feet to a point; thence

(3)  South 54 degrees 51' 29" East a distance of 233.25 feet to a point; thence

(4)  South 35 degrees 08' 31" West a distance of 54.64 feet to a point; thence

(5)  South 54 degrees 51' 29" East a distance of 107.28 feet to a point; thence

(6)  South 35 degrees 07' 57" West a distance of 137.74 feet to a point and place of beginning.

SAID PREMISES are known as Lots 1, 2 and 3 in Block 74 as shown on the Tax Map of the Borough of Edgewater.

BEING the same premises conveyed as Parcel 1 to Amland Properties Corporation by Indenture between 700 River Road Realty, dated January 3, 1983 and recorded January 3, 1983 in the Office of the Clerk of Bergen County in Deed Book 6728, page 760.

# EXHIBIT C



# AGREEMENT TO PURCHASE AND SELL REAL ESTATE
## (PARKING LOT AGREEMENT)

THIS AGREEMENT TO PURCHASE AND SELL REAL ESTATE (Parking Lot Agreement) (this "Agreement") is made and entered into as of the 25thday of August, 1997, by and between **A. P. NEW JERSEY, INC.**, a Delaware corporation with a place of business at 1501 Alcoa Building, 425 Sixth Avenue, Pittsburgh, Pennsylvania 15219 ("Seller"), and **NORTH RIVER MEWS ASSOCIATES, LLC**, a New Jersey limited liability company with a place of business c/o Mr. John De Sheplo, Esquire, 260 Columbia Avenue, Fort Lee, New Jersey 07024 ("Buyer").

1.      **Purchase And Sale.**  Seller agrees to sell, transfer, and convey to Buyer, and Buyer agrees to purchase from Seller, upon the terms, provisions and conditions hereinafter set forth those certain tracts, lots or parcels of real property situated in the Borough of Edgewater, County of Bergen and State of New Jersey, described in Exhibit A attached hereto and incorporated herein by reference (collectively, the "Property").

2.      **Purchase Price.**  The purchase price which Seller agrees to accept for the Property and which Buyer agrees to pay therefor shall be One Dollar ($1.00) (the "Purchase Price").  The Purchase Price shall be payable in cash at Closing (defined below).

3.      **Instruments Of Transfer.**  At the Closing, Seller shall convey title to the Property to Buyer by Seller's warranty deed with covenant against grantor's acts (the "Deed") and Seller and Buyer shall execute and deliver to the other, and, where applicable, file and record such instruments of conveyance, transfer and assignment, as shall be necessary or appropriate in the opinion of their respective counsel or as required by the Title Company (defined below) to transfer to Buyer all of the aforesaid right, title and interest of Seller in the Property pursuant to this Agreement.

4.      **Title Matters.**

        (a)  <u>Title Commitment</u>.  Buyer has received and approved in form and substance a commitment for an owner's fee policy of title insurance for the Property designating Buyer as the proposed insured ("Commitment").  Buyer has accepted the condition of title to the Property and any objection to the title condition is waived by Buyer for all purposes.  .

        (b)  <u>Survey</u>.  Seller shall cause to be prepared an ALTA survey of the Property from a New Jersey licensed surveyor sufficient to delete the survey exception from the Commitment. The cost of the Survey shall be borne by Seller unless this Agreement is terminated before Closing, in which case the cost of the Survey shall be borne by Buyer.

        (c)  <u>Title Insurance</u>.  Buyer shall bear the cost of the Policy of Title Insurance.

**5.**   **Warranties and Representations.**

(a)   <u>Litigation and Claims</u>.  Except as set forth on Schedule 5(a), to Seller's knowledge there are no legal actions, suits, arbitrations or other legal, administrative or governmental proceedings pending or threatened against Seller which would materially adversely affect the condition or ability to use the Property as contemplated by this Agreement, nor is Seller aware of any basis for the foregoing.

(b)   OTHER THAN THE REPRESENTATION AND WARRANTY SET FORTH IN THIS SECTION, BUYER SPECIFICALLY ACKNOWLEDGES THAT SELLER IS SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "AS IS, WITH ALL FAULTS" BASIS AND THAT BUYER SHALL HAVE AN OPPORTUNITY TO INSPECT THE PROPERTY AND IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE PROPERTY, INCLUDING WITHOUT LIMITATION:

(i)   the quality, nature, adequacy and physical condition of the Property, including, but not limited to, the structural elements, foundations, roofs, floors, appurtenances, access, landscaping, parking facilities, and the electrical, mechanical, HVAC, plumbing, sewage, and utility systems, facilities and appliances;

(ii)   the quality, nature, adequacy, and physical condition of soils, geology and any groundwater;

(iii)   the existence, quality, nature, adequacy and physical condition of the Property;

(iv)   the development potential of the Property, and the Property's use, habitability, merchantability, or fitness, suitability, value, or adequacy of the Property for any particular purpose;

(v)   the zoning or other legal status of the Property or any other public or private restrictions on use of the Property;

(vi)   the compliance of the Property or its operation with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or quasi-governmental entity or of any other person or entity;

(vii)   the presence or removal of hazardous or toxic materials, substances or wastes in, on, under, or about the Property or the adjoining or neighboring property;

(viii)   the quality of any labor and materials used in any improvements on the Property;

2.



(ix)    the condition of title to the Property, other than those representations and warranties, if any, contained in the Deed by operation of law;

(x)    the leases, service contracts, or other agreements affecting the Property; and

(xi)    the economics of the operation of the Property.

**6.    Conditions Precedent To Closing.**  Unless all of the following conditions are satisfied, Buyer shall not be obligated to purchase the Property (except as such conditions may hereafter be expressly waived in writing by Buyer):

(a)    Buyer shall have received the necessary, final, non-appealable approvals of its development plans for the Property from the Borough of Edgewater, New Jersey.  Seller agrees to execute all required consents to enable Buyer to meet this condition and all other requisite approvals; and

(b)    From the date of this Agreement until the Closing, there shall not have occurred any material adverse change in the physical condition of the Property or the condition of title to the Property.

**7.    Environmental Conditions.**  The following terms and conditions shall survive Closing hereunder and shall not be merged with and into the Deed.

(a)    <u>Hazardous Substance</u>.  For the purposes hereof, the term "Hazardous Substance" shall mean any substance, chemical or waste that is listed or defined as hazardous, toxic, or dangerous under Applicable Law (defined below), and any asbestos containing materials, radioactive materials or petroleum products.

(b)    <u>Applicable Law</u>.  For the purposes hereof, the term "Applicable Law" shall mean the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C.  §§ 9601 <u>et seq.</u>; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901, <u>et seq.</u>; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 <u>et seq.</u>; the Clean Air Act, 42 U.S.C. §§ 7401, <u>et seq.</u>; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1471 <u>et seq.</u>; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; and the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; each as amended from time to time, together with the rules and regulations promulgated thereunder, and any and all formal or informal orders, decrees or requests from the United States Environmental Protection Agency, the appropriate New Jersey state governmental and regulatory bodies, or any other governmental agency, authority or instrumentality having jurisdiction and any similar state and local laws and ordinances and the regulations implementing such statutes; together with any and all federal, state, and local environmental or land use laws, rules, ordinances, or regulations.

3.

(c)     Indemnification of Seller.  Buyer shall indemnify, defend and hold Seller harmless from any and all claims, demands, causes of action, and suit or suits, including all foreseeable and unforeseeable consequential damages, occurring on or after the Closing Date arising under Applicable Law related to Buyer's (or, during Buyer's ownership of the Property, any operators' or any third parties') use of the Property and/or any and all activities relating thereto.

(d)     Release of Seller.  Except in the event that Seller remains in default on any payment obligation after receiving notice of such default and opportunity to cure as set forth in Section 8, Buyer expressly releases Seller and agrees to waive all rights that it may have to seek contribution from Seller for any response costs or claims that may arise as a result of the actions or inactions of Seller and any previous owner, operator or third party on or with respect to the Property relating to Hazardous Substances.  Nothing in this provision shall alter or expand the parties' rights or obligations under the Multi Party Agreement, a copy of which is attached hereto as Exhibit B and incorporated by reference herein.

## 8.     Default.

(a)     By Seller.  If Seller fails to perform any of its obligations under this Agreement, that certain Agreement to Purchase and Sell Real Estate between the parties dated as of June 1997 (the "Building Parcel Agreement"), or the Multi Party Agreement, the same shall constitute a default of this Agreement and thereupon Buyer, at its option, may declare a forfeiture by written notice to Seller ("Notice of Seller's Default").  At the expiration of forty-five (45) days after the Notice of Seller's Default, if Seller has not remedied the default, or if Seller has not exercised all efforts to remedy the default as quickly as possible where the default is not capable of being remedied in forty-five (45) days (an "Extended Default"), Buyer may declare this Agreement null and void.  In any event, if an Extended Default is not remedied within 120 days after the Notice of Seller's Default, Buyer may declare this Agreement null and void.

(b)     By Buyer.  If Buyer fails to perform any of its obligations under this Agreement, the Building Parcel Agreement or the Multi Party Agreement, the same shall constitute a default of this Agreement and thereupon Seller, at its option, may declare a forfeiture by written notice to Buyer ("Notice of Buyer's Default").  At the expiration of forty-five (45) days after the Notice of Buyer's Default, if Buyer has not remedied the default, or if Buyer has not exercised all efforts to remedy the default as quickly as possible where the default is not capable of being remedied in forty-five (45) days (an "Extended Default"), Seller's remedies shall be as follows:

(i)     if the default occurs before Closing and is not cured as described in Section 8(b), declare the Agreement null and void; or

(ii)    if the default occurs after Closing and Seller is not in default, or in the event of Force Majeure (as defined in the Building Parcel Agreement) that is not

remedied within the time limits set forth in Section 9 of the Building Parcel Agreement, Buyer shall immediately either:

(A)   re-convey the Property to Seller for the Purchase Price; or

(B)   pay to Seller $500,000, secured by the personal guarantee of Fred Daibes substantially in the form and substance attached hereto as Exhibit C (the "Guarantee").  Such payment is a negotiated amount, which constitutes liquidated damages, and is not indicative of the fair market value of the Property.  Such amount shall be payable in immediately available U.S. funds without setoff to the following account:.

Mellon Bank NA, Pittsburgh, PA
ABA #043 000 261
Account Number:  #000-1206
Account Name:  Aluminum Company of America;

In any event, if an Extended Default is not remedied within 120 days after the Notice of Buyer's Default, Seller may elect to exercise its remedies under this Section 8(b)(i) or (ii).

(c)   Limitation of Liability.  In the event of default under this Agreement, the remedies of the parties are limited to the remedies set forth in Sections 8(a) and (b) above. No party shall be liable for any incidental or consequential damages for default under this Agreement.

(d)   Waiver of Breach.  The waiver by either party of any condition or breach by the other party of any term, covenant, or condition herein contained shall not be deemed to be a waiver of any other condition of any subsequent breach of the same or any other term, covenant, or condition herein contained.

9.   Closing.

(a)   Date and Location.  The purchase and sale transaction contemplated by this Agreement shall close (the "Closing") on or before October 31, 1997, or on such other date as the parties may otherwise mutually agree (the "Closing Date"); provided, however, that the Closing Date shall not be later than December 31, 1997.  The Closing shall be held at a location which is mutually agreeable to both parties.

(b)   Seller's Obligations.  At the Closing, Seller shall:

(i)   Deliver to Buyer a duly executed and acknowledged deed in substantially the form and substance as Exhibit D, attached hereto (the "Deed");

(ii)   Deliver to Buyer a duly executed Affidavit of Title in substantially the

5.

form and substance as Exhibit E attached hereto;

      (iii)    Deliver to Buyer possession of the Property;

      (iv)    Deliver to Buyer reasonable evidence of Seller's capacity and authority for closing the transaction as required by the Title Company;

      (v)    Deliver documents reasonably requested by the Title Company as administrative requirements for closing this transaction, including but not limited to an ALTA survey; and

      (vi)    Deliver to Buyer an Owner's Policy of Title Insurance in the amount of the Purchase Price, dated as of the Closing Date.

    (c)    <u>Buyer's Obligations</u>.  At the Closing, Buyer shall:

      (i)    Deliver to Seller the Purchase Price.

      (ii)    Deliver to Seller the Guarantee.

      (iii)    Deliver to Seller the cost of the Policy of Title Insurance and the title search;

      (iv)    Deliver to Seller reasonable evidence of Buyer's capacity and authority for closing the transaction; and

      (v)    Deliver documents reasonably requested by the Title Company as administrative requirements for closing this transaction.

    (d)    <u>Taxes</u>.  General real estate taxes for the then-current year relating to the Property shall be prorated as of the Closing Date and shall be adjusted in cash at Closing. If the Closing shall occur before the tax rate is fixed for the then-current year, the apportionment of taxes shall be upon the basis of the tax rate for the next preceding year applied to the latest assessed valuation.  All special taxes or assessments prior to the Closing Date shall be paid by Seller.  Any rebates or refunds of taxes paid prior to Closing shall be for Seller's benefit.  Seller shall pay all transfer tax on the Property that becomes due as a result of the transactions contemplated by this Agreement.

    (e)    <u>Costs</u>.  Except to the extent specifically allocated in this Agreement, each party shall pay its share of the normal and incidental costs associated with the Closing which are routinely incurred by a Seller and Buyer in a transaction of this character in the county where the Property is located.

    **10.    Risk Of Loss; Condemnation.**  Seller shall assume the risk of loss, destruction or damage to the Property by fire, Act of God, other casualty, or condemnation

Case 2:14-cv-08129-MCA-LDW   Document 6   Filed 03/17/15   Page 85 of 103 PageID: 117



prior to the Closing Date and the transfer of title to the Property to Buyer. Buyer assumes, as of the Closing Date and transfer of title, all hazards of damage to or destruction of the Property and of the taking of the Property or any part thereof for public use, and agrees that no such damage, destruction or taking shall constitute a failure of consideration. Upon the execution of this Agreement, Buyer shall have an insurable interest in the Property.

11.   **Brokers.**  Seller and Buyer each represent and warrant to the other that no real estate brokers or finders are or were involved with respect to any of the transactions contemplated by this Agreement. Each party hereto will indemnify and save harmless the other from any claim or claims made by any brokers or finders for any commissions or compensation alleged to be due by reason of the indemnifying party involving such brokers or finders.

12.   **Notices.**  All notices, demands, elections, requests, consents and other communications hereunder shall be in writing and shall be given by personal delivery or sent by certified or registered mail, postage prepaid, return receipt requested and addressed to the parties hereto at the addresses below, or sent by facsimile to the parties at the facsimile numbers below, or at such other address or facsimile number as a party may designate:

Seller

Attention:   Mgr. - Corporate Real Estate
2109 Alcoa Building
425 Sixth Avenue
Pittsburgh, PA 15219
Facsimile No.: (412) 553-2661
Telephone No.: (412) 553-2614

Buyer
Attention:   Mr. John De Sheplo
260 Columbia Avenue
Fort Lee, NJ 07024
Facsimile No.: (201) 224-0572
Telephone No.: (201) 224-6679

Mr. Fred Daibes
725 River Road
Edgewater, NJ 07020
Facsimile No.: (201) 313-9044
Telephone No.: (201) 224-0003

with copy to: David Carmel, Esquire
523 River Road
Edgewater, NJ 07020

7.

Facsimile No.: (201) 943-5614
Telephone No.: (201) 943-9160

13.   **Non-Foreign Person.**

(a)   <u>Seller's Certification.</u>  Seller certifies and affirms that Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1954, as amended.  Seller will execute at or prior to the Closing Date such appropriate affidavit or affidavits as may be necessary to evidence same in accordance with Treasury Department Regulation 1.1445-2T(b)(2)(iii).

(b)   <u>Buyer's Certification.</u>  Buyer certifies and affirms that Buyer is not a "foreign person" within the meaning of the federal International Investment Survey Act of 1976, as amended, 22 U.S.C. §3101, <u>et seq.</u>  Buyer will execute at or prior to the Closing Date such appropriate affidavit or affidavits as may be necessary to evidence the same.

14.   **Like-Kind Exchange.**  Seller may transfer or convey the Property to Buyer as a like-kind exchange pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, through the use of a qualified intermediary; provided that the like-kind exchange does not delay Closing or affect any obligation or requirement of this Agreement, the Building Parcel Agreement or the Multi Party Agreement.  If Seller elects, in its sole discretion, to convey or transfer the Property pursuant to such a like-kind exchange, Buyer shall cooperate with Seller in good faith to effect such exchange.  Buyer shall not incur any additional costs as a result of Seller's election to convey or transfer the Property pursuant to a like-kind exchange.

15.   **Headings.**  The headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation of this Agreement.

16.   **Merger.**  All understandings and agreements heretofore had between the parties, oral or written, are merged into this Agreement, which alone fully and completely expresses their understanding.

17.   **Modification.**  This Agreement shall not be modified or amended except by a written instrument duly executed by the parties hereto.

18.   **Binding Effect And Assignment.**  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto.  Neither party shall assign this Agreement without the prior written consent of the other, which consent shall not be unreasonably

8.



withheld.  Any attempted assignment without such prior written consent shall be void.

19.     **Governing Law.**  This Agreement shall be construed and governed in accordance with the laws of the State of New Jersey.

20.     **Prohibition Against Recording.**  Neither Buyer nor Seller shall cause this Agreement, nor any part or memorandum thereof, to be placed or filed of record.

21.     **Modified Time Of The Essence.**  If full performance of this Agreement is not completed by the Closing Date, either party shall have the right thereafter to declare time to be of the essence of this Agreement by giving written notice thereof to the other party.  Such notice shall contain a declaration that time is of the essence and shall fix the time, place and date of final settlement, which date may not be sooner than thirty (30) days following the effective date of such notice.

22.     **Survival.**  Sections 5, 7 and 8 shall survive the Closing and the consummation of the transaction contemplated by this Agreement.

23.     **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall constitute an original of this Agreement, but all such counterparts shall constitute one and the same instrument.



9.

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement in duplicate as of the day and year first above written.

WITNESS:

By: _____

SELLER:
A. P. NEW JERSEY, INC.

By: _____

Its: _Vice President_

_____

WITNESS:

By: _____

VINCENT M. SALVATURE
Attorney At Law
Of The State of New Jersey

BUYER:
NORTH RIVER MEWS ASSOCIATES, LLC

By: _____
North River Mews, Inc., Managing Member
Fred A. Daibes, President

10.

**EXHIBIT A**

S-046265
Schedule A Description
Continued

TRACT II  (Affects Fee Policy Only)
BEGINNING at a point formed by the intersection of the northerly line of Russell
Avenue and the westerly line of River Road; thence;
(1)  Along the northerly line of Russell Avenue North 54°54'09" West a distance of
196.74 feet to a point; thence
(2)  North 35°05'51" East a distance of 100.00 feet to a point; thence
(3)  North 54°54'09" West, a distance of 40.00 feet to a point; thence
(4)  North 35°05'51" East, a distance of 350.90 feet to a point; thence
(5)  North 54°54'09" West, a distance of 178.01 feet to a point; thence
(6)  North 32°53'06" East a distance of 19.12 feet to a point; thence
(7)  South 51°43'06" East a distance of 344.78 feet to a point on the West line of
River Road; thence
(8)  Along the West line of River Road South 37°48'06" West a distance of 20.79
feet to a point; thence
(9) Along a curve to the left having a radius of 400.92 feet and an arc distance
of 95.60 feet to a point; thence
(10) Along the West line of River Road South 24°08'21" West 329.50 feet to a
point; thence
(11) Along the West line of River road South 21°41'51" West 11.79 feet to the
point or place of BEGINNING.

For Information Only:
Being also known as Lots 2, 4 through 10 inclusive, 11 through 15 inclusive in
Block 71 as shown on the Tax Map of the Borough of Edgewater.

Being more particularly described as follows in accordance with a survey made by
Boswell Engineering, dated August 13, 1997:
Tract II:  (Affects Fee Policy Only)
Beginning at a point formed by the intersection of the northerly line of Russell
Avenue (45 feet wide) with the westerly line of River Road (33 feet wide), and
running thence
(1) Along the northerly line of Russell Avenue, North 54°53'09" West, 196.66 feet
to a point; thence
(2) Along the westerly line of Lot 16 in Block 71, North 35°06'51" East, 100.00
feet to a point; thence
(3) Parallel with and 100.00 feet distant from Russell Avenue, North 54°53'09"
East, 40.00 feet to a point; thence
(4) Along the easterly line of lands now or formerly of The Edgewater Board of
Education, North 35°06'51" East, 350.90 feet to a point in the easterly terminus
of Winterburn Place (30 feet wide); thence
(5) Along the northerly line of Winterburn Place, North 54°53'09" West, 178.14
feet to a point; thence
(6) Along the easterly line of Lot 27 in Block 68, North 32°53'06" East, 24.78
feet to a point; thence
(7) Along the southerly line of Lot 3 in Block 68, South 50°44'51" East, 344.34
feet to a point in the westerly line of River Road; thence
(8) Along the westerly line of River Road in the southerly direction, South
37°48'06" West, 16.88 feet to a point of curvature; thence
(9) Continuing along the same on a curve to the left, having a radius of 400.92
feet, an arc distance of 95.60 feet to a point of tangency; thence
(10) Still along the same, South 24°08'21" West, 333.45 feet to a point; thence
(11) Still along the same, South 21°42'38" West, 11.79 feet to the point of
beginning.

Continued

BEING the same premises conveyed to the Grantor herein by Deed of Borough of Edgewater dated July 30, 1991 and recorded in the Bergen County Clerk's Office on July 31, 1991 in Deed Book 7459, Page 431.

STATE OF NEW JERSEY )
　　　　　　　　　　　　　)ss.:
COUNTY OF BERGEN 　　　)

　　　**BE IT REMEMBERED** that on August 25, 1997, before me the subscriber, personally appeared CATHERINE L. GARFINKEL who, by me being duly sworn on her oath, deposes and makes proof to my satisfaction, that she is the Assistant Secretary of A.P. New Jersey, Inc., the Corporation named in the within Instrument; that KEVIN L. MCKNIGHT is the Vice President of said Corporation; that the execution, as well as the making of this Instrument, has been duly authorized by a proper resolution of the Board of Directors of the said Corporation; that deponent well knows the corporate seal of said Corporation; and that the seal affixed to said Instrument is the proper corporate seal and was thereto affixed and said Instrument signed and delivered by said Vice President as and for the voluntary act and deed of said Corporation, in presence of deponent, who thereupon subscribed his name thereto as attesting witness and that the full and actual consideration paid or to be paid for the transfer of title to realty evidenced by the within deed, as such consideration is defined in P.L. 1968, c. 49, Sec. 1(c), is $1.00.

Sworn to and subscribed before
me, the date aforesaid.

David Carmel
**Attorney at Law**
**State of New Jersey**

CATHERINE L. GARFINKEL

A.P. NEW JERSEY, INC.
1991
DELAWARE

EXHIBIT A

Property Description

S-046265
Schedule A Description
Continued

TRACT II  (Affects Fee Policy Only)
BEGINNING at a point formed by the intersection of the northerly line of Russell
Avenue and the westerly line of River Road; thence:
(1)  Along the northerly line of Russell Avenue North 54°54'09" West a distance of
196.74 feet to a point; thence
(2)  North 35°05'51" East a distance of 100.00 feet to a point; thence
(3)  North 54°54'09" West, a distance of 40.00 feet to a point; thence
(4)  North 35°05'51" East, a distance of 350.90 feet to a point; thence
(5)  North 54°54'09" West, a distance of 178.01 feet to a point; thence
(6)  North 32°53'06" East a distance of 19.12 feet to a point; thence
(7)  South 51°43'06" East a distance of 344.78 feet to a point on the West line of
River Road; thence
(8)  Along the West line of River Road South 37°48'06" West a distance of 20.79
feet to a point; thence
(9) Along a curve to the left having a radius of 400.92 feet and an arc distance
of 95.60 feet to a point; thence
(10) Along the West line of River Road South 24°08'21" West 329.50 feet to a
point; thence
(11) Along the West line of River road South 21°41'51" West 11.79 feet to the
point or place of BEGINNING.

For Information Only:
Being also known as Lots 2, 4 through 10 inclusive, 11 through 15 inclusive in
Block 71 as shown on the Tax Map of the Borough of Edgewater.

Being more particularly described as follows in accordance with a survey made by
Boswell Engineering, dated August 13, 1997:
Tract II:  (Affects Fee Policy Only)
Beginning at a point formed by the intersection of the northerly line of Russell
Avenue (45 feet wide) with the westerly line of River Road (33 feet wide), and
running thence
(1) Along the northerly line of Russell Avenue, North 54°53'09" West, 196.66 feet
to a point; thence
(2) Along the westerly line of Lot 16 in Block 71, North 35°06'51" East, 100.00
feet to a point; thence
(3) Parallel with and 100.00 feet distant from Russell Avenue, North 54°53'09"
East, 40.00 feet to a point; thence
(4) Along the easterly line of lands now or formerly of The Edgewater Board of
Education, North 35°06'51" East, 350.90 feet to a point in the easterly terminus
of Winterburn Place (30 feet wide); thence
(5) Along the northerly line of Winterburn Place, North 54°53'09" West, 178.14
feet to a point; thence
(6) Along the easterly line of Lot 27 in Block 68, North 32°53'06" East, 24.78
feet to a point; thence
(7) Along the southerly line of Lot 3 in Block 68, South 50°44'51" East, 344.34
feet to a point in the westerly line of River Road; thence
(8) Along the westerly line of River Road in the southerly direction, South
37°48'06" West, 16.88 feet to a point of curvature; thence
(9) Continuing along the same on a curve to the left, having a radius of 400.92
feet, an arc distance of 95.60 feet to a point of tangency; thence
(10) Still along the same, South 24°08'21" West, 333.45 feet to a point; thence
(11) Still along the same, South 21°42'38" West, 11.79 feet to the point of
beginning.

**Schedule 5(a)**

Litigation

1.  Complaint filed in Tax Court of New Jersey contesting 1997 real property tax assessment on 732 River Road, Block 71, Lot 2

EXHIBIT B

MULTI-PARTY AGREEMENT

TAB 2

EXHIBIT C

PERSONAL GUARANTEE LETTER
OF
FRED DAIBES

TAB 17

EXHIBIT D

DEED

TAB 8

EXHIBIT E

AFFIDAVIT OF TITLE

TAB 10

# EXHIBIT D

# ENVIRONMENTAL INDEMNITY AGREEMENT

**THIS AGREEMENT** made this 13th day of March, 1999

BETWEEN:   A. P. NEW JERSEY, INC.
       a New Jersey corporation
       (hereinafter called "A. P.")

AND:     NORTH RIVER MEWS ASSOCIATES, L.L.C.
       a New Jersey limited liability company
       (hereinafter called "North River")

AND:     RIVER ROAD IMPROVEMENTS PHASE II, INC.
       a Delaware corporation
       (hereinafter called "River Road")

## WITNESSETH:

**WHEREAS,** North River is the owner of certain real estate located in the Borough of Edgewater, County of Bergen, State of New Jersey pursuant to an Agreement to Purchase and Sell Real Estate entered into on June 27, 1997, by and between North River and A. P. (the "Purchase Agreement") and a Transfer Deed executed by A. P. on August 25, 1997, and recorded on August 26, 1997 as Instrument Number 104092 (the "Property"); and

**WHEREAS,** North River, River Road, A. P. and the County of Bergen, New Jersey, were all parties to a Multi-Party Property Acquisition Agreement also entered into on June 27, 1997, whereby, inter alia, North River and River Road agreed that they would cause to be demolished all of the structures on the Property; and

**WHEREAS,** North River, River Road, A. P. and the County of Bergen, New Jersey, were all parties to a Funding Agreement entered into on September 23, 1997, whereby, inter alia, the parties agreed that, to the extent that Building 12 on the Property is not demolished, A. P. shall withhold or cause Bergen County to withhold payment of $500,000 of the demolition funding until, among other conditions, A. P. receives a "No Further Action" letter from the NJDEP covering all the entire Property, including Building 12; and

**WHEREAS,** North River presently does not intend to demolish Building 12.

**NOW, THEREFORE,** in consideration of the premises and of such mutual promises, covenants and undertakings, which the parties acknowledge to be received and sufficient, the parties hereto agree as follows:

1.      In addition to and notwithstanding any other agreement or obligation of the parties, to the extent that Building 12 is not demolished, North River and River Road shall indemnify, defend and hold A. P. harmless from any and all claims, demands, causes of action, and suit or suits, including all foreseeable and unforeseeable consequential damages, occurring at any time before, during or after North River's ownership of the Property, relating to Building 12 and the land under and adjacent thereto, arising under Applicable Law (as defined in the Purchase Agreement), including, but not limited to, remediation and disposal costs and expenses related to PCBs.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year first above written.

Witness:                                    **A.P. New Jersey, Inc.**

By: _____

JOHN MILLETT, Vice President

Witness:                                    **North River Mews Associates, L.L.C.**

By: _____

North River Mews, Inc., Managing Member, FRED A. DAIBES, President

Witness:                                    **River Road Improvements Phase II, Inc.**

By: _____

FRED A. DAIBES, President

STATE OF NEW JERSEY         :

                                         :     ss:

COUNTY OF BERGEN          :

      **BEFORE ME,** a Notary Public, in and for said State, personally appeared Fred A. Daibes, President of North River Mews, Inc., which is the managing member of North River Mews Associates, L.L.C., a New Jersey limited liability company, and President of River Road Improvements Phase II, Inc., and stated and acknowledged that he was duly authorized in his capacities to execute the foregoing instrument for and in the name and behalf of the company and further stated and acknowledged that he had so signed, executed and delivered said foregoing instrument for the consideration and purposes therein mentioned and set.

      WITNESS my hand and official seal on this 15th day of March , 1999.

                                                   Notary Public
                                                   MARK J. SOKOLICH
                                                   Attorney at Law
                                                   State of New Jersey

COMMONWEALTH OF PENNSYLVANIA    :

                                              :     ss:

COUNTY OF ALLEGHENY            :

      **BEFORE ME,** a Notary Public, in and for said State, personally appeared John Millett, Vice President of A.P. New Jersey, Inc., and stated and acknowledged that he was duly authorized in his capacity to execute the foregoing instrument for and in the name and behalf of the company and further stated and acknowledged that he had so signed, executed and delivered said foregoing instrument for the consideration and purposes therein mentioned and set.

      WITNESS my hand and official seal on this 15th day of March , 1999.

                                                   Notary Public
                                                   MARK J. SOKOLICH
                                                   Attorney at Law
                                                   State of New Jersey